[PHILADELPHIA, MARCH 18, 1833.]

## HUTCHINSON and Others *against* SANDT and Others.

### APPEAL.

An inquisition taken under a commission in the nature of a writ *de lunatico inquirendo*, finding that a person is of unsound mind, and has been so for a certain space of time prior to the finding, is *prima facie* evidence to show that a deed purporting to have been executed by such person during that period, is invalid on the ground of the mental incompetency of the grantor.

It is, however, only *prima facie* evidence, and may be rebutted by the testimony of those who were acquainted with him during the period in question, and knew him to have been of sound mind, or at least to have had lucid intervals, and that the deed was executed by him during one of those intervals—

And the members of the inquest who found him to be of unsound mind, are competent to prove such facts, so far as they are within their knowledge, but they cannot be examined for the purpose of proving what they conceived to be the nature of their finding, and that they did not intend to find or represent that he had been of unsound mind for the space of five years anterior to the inquisition, or that they did not know until after their report had been made, that it was retrospective in its operation.

ON an appeal from the judgment of the Circuit Court of *North-ampton* County, held by HUSTON, J. in *April,* 1831, it appeared that this was an ejectment for one-sixth part of a tract of land containing two hundred and forty-five acres and nineteen perches, in *Lower Mount Bethel* township.

It was admitted that *John Hutchinson* died siezed of the premises in dispute, and the plaintiffs proved that they were the children of *Andrew Hutchinson,* also deceased, who was one of the six children of the said *John Hutchinson.*

After having proved their pedigree, the plaintiffs gave in evidence the proceedings under a commission in the nature of a writ *de lunatico inquirendo* awarded by the Court of Common Pleas of *Northamp-*

(Hutchinson and others *v.* Sandt and others.)

*ton* county, by which the said *Andrew Hutchinson* was found *non compos mentis.* The inquisition was taken on the 20th of *February,* 1818, and found " that the said *Andrew Hutchinson* at the time of taking this inquisition, is of unsound mind, memory and capacity, so that he is not capable of governing himself or managing his estate, and that the said *Andrew Hutchinson,* hath been in the said state of unsound mind, memory and capacity for the space of five years last past and upwards : That he is of the age of thirty-four years and upwards, and is lawfully siezed in his demesne as of fee of and in a certain tract of land situate, &c. containing one hundred acres be the same more or less ; possessed of personal estate of the value of two hundred dollars or thereabouts, and in right of his wife *Jane* entitled to one-eighth part of the real and personal estate of *Nathaniel Brittain,* deceased, subject to the dower or thirds of the widow of the deccased therein : That he has not alienated any of his estate during his incapacity to the knowledge of the inquest," &c.

On the 24th of *April,* 1818, this inquisition was confirmed by the court, and committees of the person and estate appointed.

The defence relied upon was, that *Andrew Hutchinson* was not a lunatic, but was merely subject to fits, in the intervals between which, he was competent to the transaction of business : That he was in the habit of going to frolics, hauling stone, wood, and the like, and to raisings in the neighbourhood : That he went to church, and was a member of the church : That in the year 1817 he joined in a deed with his brothers and sisters to convey all the estate of their father to *James* and *William Hutchinson,* the administrators of their father's estate, for the purpose of completing a family arrangement which had been entered into in his lifetime, by which a part of his land was to be sold for the payment of debts and the residue to be conveyed to his children who were to pay money to him : That the land in dispute was the part designated for the payment of debts, and in pursuance of this arrangement had been sold to *John Sandt,* one of the defendants who had paid a high price for it : That *Andrew Hutchinson* had received the tract which had been designated for him, and that his family had destroyed the timber on it.

On the trial, the defendant's counsel offered *John Jacoby* and *Morris Morris,* two members of the inquest who had joined in the inquisition, as witnesses, to prove, not only the state of *Andrew Hutchinson's* mind and his capacity to transact business, but that at the time of signing the inquisition they did not mean to overreach the period of five years. The evidence was objected to by the counsel for the plaintiffs, but the objection was over-ruled by his Honour, and the witnesses were sworn and examined. An exception was taken to his opinion which he noted.

A great mass of other evidence was given on both sides in reference to the questions growing out of the controversy, but as the argument here, was by the direction of the court restricted to a single

(Hutchinson and others *v.* Sandt and others.)

question, upon which alone the court gave an opinion, it is deemed superfluous to give a statement of it.

The jury, under the direction of the judge, found a verdict for the defendants, and the plaintiffs moved for a new trial, for which they filed eighteen reasons, twelve of them founded on the admission or rejection of evidence, and six on the charge of the court.

The tenth reason, which alleged that there was error in admitting the evidence of *John Jacoby* and *Morris Morris*, is the only one which is now material.

The Circuit Court, having refused a new trial, an appeal was entered to the court in bank.

*Brooke* and *J. M. Porter* for the appellants.—A strong disposition has been for some time manifested by our courts, to narrow the limits of the rule by which parol evidence is permitted to be given to affect a written instrument of any kind, and the objections to it are more numerous and striking in reference to a record, than to any other written instrument. That a record, properly so called, can be impugned by such evidence will not be pretended. The record of an inquisition in a case of lunacy, it is true, in some respects differs from an ordinary record. It may be disputed in the manner prescribed by law, but the evidence for that purpose ought to be direct and clear, derived from unquestionable sources, and given in the proceeding which the law provides as a remedy for errors in such cases. An inquisition when confirmed and recorded, is to many purposes a record, and incapable of contradiction by parol evidence. It may be traversed, but cannot be overhauled or inquired into collaterally. In this respect there is no difference in principle between such a record, and the record of an ordinary verdict. If it could be destroyed collaterally by parol evidence derived from any source, records would be brought into contempt, and a door opened to fraud. No case can be found, in which the record of an inquest under a commission of lunacy has been permitted to be contradicted by parol evidence in a collateral suit, but on the contrary, in the case of *Selin* v. *Snyder*, 7 *Serg. & Rawle*, 172, evidence of a similar character in reference to the analagous case of proceedings in the Orphan's Court for the sale of an intestate's lands, was held to be inadmissible. Still less can it be contradicted or its effect destroyed by a juror, who was himself a party to it. A juror who has concurred in rendering an ordinary verdict, it must be conceded on the opposite side, cannot be heard in opposition to it. He may be heard to sustain, but not to impeach his verdict. He cannot be permitted to say, he did not mean to find what his verdict declares he did find. This is a rule well established by the policy of the law, and which the safety of those whose interests are involved in legal proceedings, requires should remain unshaken. If it were otherwise, it would strike at every thing dear to the community ; it would furnish a temptation to tampering with jurors, and put it in the power of one man to swear

(Hutchinson and others *v.* Sandt and others.)

away the title of another, derived under the solemn act of the witness himself, when filling another character. In this point of view, the policy, and consequently the law, in respect to inquisitions and other verdicts, are the same, however they may differ in other respects; yet the Circuit Court permitted jurors after the lapse of eleven or twelve years to destroy their verdict, by swearing they did not mean to do, what they have sworn they have done.

If the plaintiffs did introduce the record in the first instance, that, even if an error, would not justify the error of permitting a record to be collaterally impeached, particularly by those who participated in making it. If the inquest was wrong, those who felt themselves aggrieved by their finding, were not without remedy. An application to the court under whose authority the proceeding took place, if made in due time, and in the proper manner, would have put right whatever was wrong. A traverse is the established remedy in such cases. It is, however, now too late to interfere with the inquisition, even before the proper tribunal, and in the regular mode. A chancellor, after such a lapse of time, would not listen to an application of the kind. If the principle contended for on the other side be established, the precedent will be full of mischief. Legal proceedings, instead of quieting controversies, will only be the commencement of endless litigation. *Dana* v. *Tucker,* 4 *John. R.* 487. *Cluggage* v. *Swan,* 4 *Binn.* 150. 3 *Stark. Ev.* 1043. 1278. *Add. Rep.* 380. *Campbell* v. *Wallace,* 3 *Yeates,* 572. *Iddings* v. *Iddings,* 7 *Serg. & Rawle,* 115. *Reed* v. *Jackson,* 1 *East,* 355. *Wolverton* v. *The Commonwealth,* 7 *Serg. & Rawle,* 283. 2 *South. Reps.* 486. 14 *Mass. Rep.* 246.


*Hepburn* and *Jones* for the appellees.—The jurors were called, not to impeach their verdict, but to show that in point of fact, it was not as it was rendered. Their evidence was intended to correct a mistake in their finding, and make it appear what it really was. For this purpose they would have been competent witnesses, even if this had been an ordinary verdict, and not an inquisition. *Jackson* v. *Dickson,* 15 *John. R.* 309. *Cogan* v. *Ebden,* 1 *Burr.* 383. *Rex* v. *Simmons,* 1 *Wils.* 329. *Smith* v. *Cheetham,* 3 *Caines,* 57. *Ford* v. *Simpson,* 8 *Pick.* 359. But there is no analogy between an inquisition like this and a verdict, which is a record, and cannot be contradicted. An inquisition is an *ex parte* proceeding and differs essentially from a verdict. There is no principal common to both. The object of the inquisition is to deprive the lunatic of the possession of his property. It does not pass a right as a verdict does, and is traversable. A jury in an ordinary case find their verdict under the charge of the court, which an inquest do not; they are confined together until they render their verdict, which an inquest is not; their verdict will be set aside, if they have intercourse with others, which is not the case in respect to an inquisition. An execution follows a verdict, but not an inquisition. If then it were universally true, that a juror could

(Hutchinson and others *v.* Sandt and others.)

not be heard in opposition to his verdict, which is denied, the rule would not be applicable to an inquisition in a case of lunacy, which never acquires the sanctity of a record. It is conclusive of nothing. It is only *prima facie* evidence, and may be controverted by other evidence. Acts done during a lucid interval are binding, though done during the period covered by the inquisition. *Col. on Lun.* 169. 162. 168. 182. 389. 390. 395. If this be so, there must be a time and a mode of showing the existence of a lucid interval, and this can only be done as it was in this case. The object of the defendants was to show, that the arrangement under which they derived title, was made and carried into effect during a lucid interval. It is obvious then, that a traverse could have afforded them no relief, for the inquisition found that *Andrew Hutchinson* was of unsound mind, and said nothing about lucid intervals. If it had been traversed, it must have been set aside altogether, or not at all, and of course the object would have been defeated. It could be disputed in reference to a matter of this kind, only when offered in evidence on the opposite side. Both the jurors who were examined denied that the finding was as the inquisition declared, and it is difficult to discover a reason why they should not be permitted to tell the truth, and declare what their finding really was. If they are not suffered to do so, the plaintiffs are enabled to take advantage of their own error. They first called two of the inquest to support the inquisition, before it had been given in evidence against them, and if it was proper for them to give such evidence, the defendants clearly had a right to rebut it, by opposite evidence of the same kind.

But if the defendants are estopped by the record, so are the plaintiffs, for estoppels are mutual. The inquisition finds that the lunatic, while he was a lunatic, never aliened his lands. Nevertheless, the plaintiffs undertake to show that he did. If the inquisition is to be opened for one party, it must be for the other; and if it was competent to the appellants to show that the alienation was during the period when his lunacy is supposed to have existed, it was competent to the appellees to show, that it was done during a lucid interval.

The opinion of the court was delivered by

Kennedy, J.—A number of reasons have been assigned by the counsel of the plaintiffs, who are the appellants, why the verdict should be set aside and a new trial granted in this case, many of which do not appear to be sustained in fact, and none of the whole both in fact and law, in the opinion of the court, excepting the tenth; which is, that the Circuit Court erred in admitting the evidence of *John Jacoby* and *Morris Morris.* So far as the evidence of these two witnesses, who had been members of an inquest and joined with their fellows in signing and sealing an inquisition, on the twentieth of *February,* 1818, wherein they reported *Andrew Hutchinson* to be of unsound mind, memory and capacity, so that he was not capable of governing himself, or of managing his estate, and that he had been

(Hutchinson and others *v.* Sandt and others.)

in that state of mind for the space of five years then last past and upwards, was admitted to show what they conceived the nature of their finding in their report to be, and that they did not intend thereby to find or represent that he had been of unsound mind, memory and capacity, for the space of five years anterior to that date, or that they did not know until after their report had been made, that it was retrospective as to the state of *Andrew Hutchinson's* mind, this court think it ought not to have been received. The inquisition had been given in evidence by the plaintiffs, to show that *Andrew Hutchinson* was, at the time the deed of conveyance purported to have been executed by him, to wit, on the fifteenth of *November,* 1817, and under which the defendants claimed, of unsound mind and incompetent to make such an instrument. It was doubtless admissible for this purpose, although entirely an *ex parte* proceeding as respected the grantees in the deed, but for this reason of its being *ex parte,* it is only *prima facie* evidence, at most, of *Andrew Hutchinson's* insanity, and liable to be rebutted and done away by the testimony of those who were acquainted and conversant with him during that period, and knew him to be of sound mind, or that he had at least lucid intervals, and that the deed was executed by him at one of those times. *Jacoby* and *Morris,* notwithstanding that they had, as members of the inquest joined in executing the inquisition, were still competent witnesses to testify to his sanity or insanity at *any time* of their own knowledge, or to his having lucid intervals, or to any facts, conduct and conversations of his, during that period of five years, and especially at the time of executing the deed, which came within their knowledge and observation, and from which the sanity or insanity of the party might have been fairly inferred by the jury. But to permit them to explain away the legal effect, and to contradict the tenor of their report, after it had been made to the court and confirmed; or to testify that they conceived it to be of quite a different import from what it really was; or that they signed it without knowing that it contained a statement which they did not know to be true, or knew was not so, would, as it appears to me, be attended with serious and dangerous consequences. It would be permitting members of an inquest to prove what, if true, ought justly to subject them to very severe censure. As members of the inquest, they were bound by law, as well as their oaths, to make a careful and diligent inquiry into the truth of the matters submitted to them, and to report nothing to be so, but what they had credible evidence of, and firmly believed to be true. It is, I conceive, upon the ground of this care and diligence in their search after truth, that such great credit and effect are given to their report, as to make it *prima facie* evidence, even against those with respect to whom it is altogether an *ex parte* proceeding. Indeed, after a lapse of a few years, when time and other causes shall have removed all rebutting testimony that existed to their finding, its being admissible as evidence may in effect be said to have become conclusive, and hence the necessity and

(Hutchinson and others *v.* Sandt and others.)

absolute propriety of the utmost care and circumspection being observed upon the part of the members of an inquest, to avoid setting forth any matter or thing unless convinced of its truth by credible evidence. We must presume, that these witnesses as members of the inquest, discharged their duty upon these principles. Under this view then of the matter, it appears to me, that they ought not to be permitted to testify to their own criminal neglect of duty or misbehaviour, more than jurors. In the case of *Cluggage* v. *Swan*, 4 *Binn.* 150, it was ruled by this court, that jurors were not admissible to invalidate their verdict on the ground of misconduct; and by the Common Pleas of the City and County of *Philadelphia*, in *Willing* v. *Swazey*, 1 *Browne's Rep.* 123, the same principle was settled.

I do not consider this doctrine impugned by the decision in *Ritchie* v. *Holbrooke*, 7 *Serg. & Rawle*, 458-9, where it was merely ruled that the affidavit of a juror might be received to prove the misbehaviour of *one of the parties to the suit*. Besides regarding it as a record or registry made at the time, by those members of the inquest who signed and sealed the inquisition, of what they had done, and what upon full investigation and consideration of the evidence then given they found to be true, would it not be most dangerous for the cause of truth, to substitute their recollection for their report? It might in effect be preferring parol evidence, proceeding from the frail and treacherous memory of witnesses, to that which may well be considered as partaking of the nature of record evidence; because it would be submitting both to the jury who might think proper to prefer the former to the latter and to build their faith upon it accordingly. Judicial experience, public policy, the security of public and private rights, reason, and common sense, all combine against the substitution or admission of such evidence. The decision of the Circuit Court, overruling the motion for a new trial, is reversed, the verdict set aside and a new trial granted.

New trial granted.