# In re Gangwere's Estate.

1. To defeat a widow's right of dower, the proof must be clear. If a marriage contract be alleged, its existence, and its whole contents must be clearly proved.

2. Where a marriage contract was entered into for the purpose of quieting the children of the husband, but with a promise by the husband that after showing it to his children he would destroy it, and where the husband afterwards got it from the trustee for the purpose of destroying it, and declared at the time that it should be null and void: this *may be* equivalent to a destruction of the paper, and it is not material that it was kept for years without its actual destruction.

3. The actual destruction of the contract by the husband is binding on him, and if ratified by the wife, after his death, it is binding on her.

4. The fact of witnesses being nearly related to a party, is to be weighed in a doubtful case, but should not be allowed altogether to destroy their credit, when they swear positively and are otherwise unimpeached.

5. An inquisition of lunacy finding the party a lunatic without lucid intervals is *prima facie evidence*, but not conclusive: and a petitioner for the proceeding is not estopped from asserting the truth against it, and showing that the party had lucid intervals.

6. An act done in a lucid interval by one who has been found to be a lunatic, is binding on him, but the proof of the lucid interval in which it was done, must be clear.

7. As to whether a marriage contract executed on *Sunday* be legal, the court were divided.

APPEAL by the heirs of Henry Gangwere from the decree of the Orphans' Court of *Lehigh county.*

On the petition of Jacob Gangwere, Joseph Gangwere, and Solo-

[In re Gangwere's Estate.]

mon Gangwere, a citation issued out of the Orphans' Court of Lehigh county, directed to Jacobina, the widow of Henry Gangwere, deceased, alleging, *inter alia*, that said Henry Gangwere died intestate, seized of certain real estate in said county and the county of Northampton adjoining, leaving a widow, the said Jacobina, and issue by a former marriage—that said real estate had been appraised according to law, and would be accepted at the next term by the heirs or some of them—that said Jacobina was entitled to no part or interest in said real estate, her sole interest in the estate of the said Henry Gangwere having been secured to her by a marriage contract, and requiring her to show cause why the bonds, &c., to be executed by the acceptants should not be made to the heirs respectively, without securing any part or interest therein to said widow, &c.

To this citation an answer was filed by the said widow, denying *inter alia* the existence of any valid marriage contract, as alleged in the citation, but admitting the execution of a paper by the said Henry Gangwere and herself, on the day of their marriage, to wit, on Sunday, the sixteenth day of November, 1828, immediately prior to the performance of the marriage ceremony, and which he promised, after showing it to his sons, to destroy; and alleging further the subsequent destruction of said paper by the said Henry Gangwere.

To this, a replication was filed, traversing and denying the truths of the matters alleged in said answer.

The only matter in controversy was the right of the said widow to the interest of the one-third of the valuation money of said real estate..

The petitioners proved, by the testimony of Henrietta Beitel, C. F. Beitel and others, the execution of a marriage contract between the said parties, dated Saturday, the 15th of November, 1828, and prepared for execution on that day, by C. F. Beitel, according to the instructions of the said Henry Gangwere, given about a week previous thereto, but which was not executed by the parties until Sunday morning, the 16th of said month, immediately before the performance of the marriage ceremony; and (having given notice to the respondent to produce said marriage contract) proved the contents thereof, and its existence in her possession *in* the latter part of October or beginning of November, A. D. 1846; and further proved the existence of said contract, and its contents, by the declarations and admissions of the parties thereto, and also that most of the marriages in Lehigh county are solemnized on Sunday.

The respondent then proved, by the testimony of Catharine Phlueger and David Young, *that about the last of September or the beginning of October*, 1846, a paper writing was burned by the said Henry Gangwere, at his residence in Saucon township, Lehigh county, which paper writing was alleged to be the said marriage contract.

[In re Gangwere's Estate.]

The petitioners thereupon proved, that at the time of the alleged destruction of the said marriage contract, the said Henry Gangwere was, by inquest, found in the Common Pleas of Lehigh county, a lunatic, without lucid intervals; which proceeding was founded on the petition of the said Jacobina, verified by her oath on the 12th day of April, 1847, in which she averred that he, the said Henry Gangwere, was then and had been deprived of the exercise of his rational faculties and understanding, so as to be altogether incapable of protecting himself or of managing his affairs in a proper manner, for the space of one year previous thereto; which fact the said inquest found, and also that, for a year and upwards last past, he, the said Henry Gangwere, had not enjoyed any lucid intervals; on which a committee was appointed, who continued in office until his death.

The petitioners also produced on the same point the testimony of his medical attendant, Dr. Detweiler, and others.

And the respondent, the testimony of Philip Bahl and others.

The respondent also averring that the said marriage contract was delivered up to be cancelled, and was cancelled—proved by the testimony of C. F. Beitel that, half a year or a year and a half after it was executed, Henry Gangwere, deceased, asked him for the paper, saying he wanted to destroy it—that it was not given up to him—that some time after this the parties came together, when the paper was taken away by him, they saying "*that it shall be given up.*" They also proved by the same witness that he was a trustee in the contract.

In answer to this, the complainants proved by Michael Giffert, that between three and five years after the parties were married, Henry Gangwere, in the presence of his wife, the said Jacobina, said that they had a marriage contract with each other, by which she was to have $200 or $300 after his death, and that she said nothing against it; and proved by Joseph Huber, that two or three weeks after the marriage, she said she was satisfied with it. They further proved by the testimony of Jacob Correll and A. K. Wittman, that on the 27th of September, 1846, the respondent was called on for this marriage contract—that she produced a box of papers, saying that if it was not there, she did not know where it was. It was not there, but that about four or six weeks afterwards she exhibited the contract to them, and on its being read to her, said it was of no use, because it was signed on Sunday, and would not stand law.

The Orphans' Court, on hearing the case, dismissed the citation, and directed the acceptants of said real estate to enter into recognizance to secure the purpart of the said respondent, upon the ground that the marriage contract was void in law, having been executed on Sunday; expressing an opinion that there was not sufficient evidence of its having been delivered up for cancellation—

[In re Gangwere's Estate.]

that they did not believe the paper ever was destroyed by Henry Gangwere, deceased; and if it was, they more than doubted his capacity to do such an act understandingly.

A witness, Jacob Correll, testified, *inter alia*—Mrs. Gangwere brought a paper to me, about October, 1846.    *    *    *

On cross-examination, he testified—I had seen Mr. Gangwere, four or five weeks before she showed me the paper. And in reply to a question, he said—"We talked very little to him; but what we talked to him, he answered correctly."

He testified to counting money at the house of Gangwere, with Wittman and Dr. Detweiler.

Andrew K. Wittman testified, *inter alia*—"I think the time we counted the money was between the twentieth and thirtieth of September, 1846."    *    *    *

*Re-cross-examined*—"When we counted the money, the old man was sensible, very sensible. The old woman said she did not like to have the money in the house—she wanted it put somewhere where it would be secure; she said the boys were afraid she would take some of it. I believe we told the old man the amount of money we counted—at least, it was made known in the house; the old man was present; he did not express any dissatisfaction with the amount," &c.

The opinion delivered by his Honor J. P. JONES was partly as follows:—

On the 16th November, 1828, being Sunday, a marriage was solemnized between Henry Gangwere the decedent, and Mrs. Jacobina Phlueger, before the Rev. Mr. Zeller, previous to which, and on the same day, they executed a certain writing between them, by which it would appear that it was agreed, in case she survived him, that she was to receive a certain sum per annum, in lieu of dower. She, having survived him, now claims her purpart of the appraised value of his real estate, upon three distinct grounds.

The first position taken is, that the contract, or writing before mentioned, having been executed on Sunday, and in contravention of the act of 1794, which prohibits the doing or performing of any worldly employment or business whatsoever on the Lord's day under a certain penalty, is void.

It has never, we believe, been supposed that the contract *of marriage*, entered into on that day, was void—indeed that contract stands on a footing so different from all others, that it could not with any propriety be called a worldly employment or business. In all that portion of the Christian world, which derives its doctrine and discipline from Rome, marriage is regarded as a solemn sacrament—and in Protestant countries, though divested of that high and mysterious sanction, it is still regarded as of Divine institution and with religious veneration. A contract of this kind might well be supposed to lay beyond the operation of this act of

[In re Gangwere's Estate.]

assembly. Looking at the undoubted validity of this marriage, celebrated as it was on Sunday, we were inclined to think, upon the argument, that the written contract of the parties, which preceded their marriage, and was executed on the same day, was to be regarded as a limitation or restriction of the legal effect of the contract of marriage, and so a part of that contract itself, we regarded it as constituting but one transaction. Until the marriage was had, that writing had only a contingent validity, which by that event was rendered absolute. Marriage was required to give it vitality, and in doing so, drew the dependent contract to it, merging the less in the greater, and making the two together the whole contract of marriage of these parties. In this way, we supposed that the execution of the written contract on Sunday might be cured.

Considered, however, merely in its civil and legal character as a contract, there follow upon marriage being entered into, certain rights of property, with which the law invests the husband and the wife at the moment they assume those relations towards each other. The wife's right to dower attaches upon the land of her husband immediately upon the marriage, or as, soon after as he becomes seized. That is a necessary, inevitable legal consequence of the contract of marriage, which may well enough be supposed to enter into the contemplation of the parties. Nevertheless, the estate created by that operation of law does not arise by force of any contract, express or implied. That estate is an absolute creation of the law, not of the contract of marriage. Now, though parties may enter into the contract of marriage on Sunday, and if they do so, these legal results will attach to their respective properties, yet they cannot execute deeds with regard to those properties on that day, which will be good and valid as against the prohibition of worldly employment and business. The contract of marriage does not *per se* or *in se* include any agreement, express or implied, with regard to those properties—and therefore it will not do to say that a deed of settlement, or any other contract restricting or enlarging the rights of husband or wife with regard to the other's property, is part of the contract of marriage, and as such may be executed on Sunday. There is no mutual dependence between the two contracts—for although the marriage would be good without the settlement, the settlement would not be good without the marriage. The settlement does not in any way modify the contract of marriage—it only restricts or enlarges an estate about to be created, by operation of law, upon the happening of the marriage. As a contract, it is independent—the contract of marriage being but the mere contingency, on the happening of which the settlement is to take effect. Distinct as these two contracts in their nature seem to be, we are constrained, against our first inclination, &c. &c., to come to the conclusion that that paper was void, as being executed on Sunday.

2 L

[In re Gangwere's Estate.]

But for that, we would have no difficulty in coming to conclusions adverse to her pretensions upon the two other grounds, of which the first was, that the paper having been delivered up to be cancelled, in equity was cancelled. As to that, we think there is no sufficient evidence that the paper ever was delivered up to be cancelled. And then, with regard to the third ground, that, at the alleged destruction of the paper by Henry Gangwere in the fall of 1846, he was of sound mind—we do not believe the paper was destroyed by him; and if it was, we more than doubt his capacity to do such an act understandingly. But into these matters it is not necessary to enter, if, as we suppose, that written contract was void in consequence of being executed on Sunday.

Let the citation be dismissed and the acceptant or acceptants of the real estate be directed to enter into recognizances to secure the purpart of the widow Jacobina Gangwere.

From the decree the heirs appealed.

Exceptions were filed:—

1. The court erred in their opinion that the marriage contract was void, and in not decreeing that it was valid and binding under the circumstances of the case, even though executed on Sunday.

2. The court should have decreed that the said marriage contract, being a valid one, had never been cancelled or destroyed, and therefore that the widow was not entitled to the "thirds" under the intestate law, but only to the provision made for her by the said marriage settlement.

3. The court erred in confirming the report of auditors distributing to Jacobina Gangwere the one-third of the fund in the hands of the administrator, to wit, the sum of $1215.61.

The case was re-argued by *Wright* and *Davis,* for appellants.—It was contended that the amount settled on the respondent cannot with propriety be considered in deciding the question before the court: *Glancy on Married Women* 221–3.

The form of the instrument is immaterial, nor is it necessary that the provision be said to be *in lieu of dower: id.* 222–6. The marriage contract was a valid instrument. That there was no proof before the court that the paper burned was the marriage contract. That if it were, the destruction was committed by a lunatic, by the connivance of the appellee, who was herself the petitioner, in whose petition it was averred that he had been " deprived of the exercise of his rational faculties or understanding, so as to be altogether incapable of governing and protecting himself, or of managing his affairs in a proper manner, for a year and upwards prior to April 12, 1847," and who was found by inquest to have been " of insane mind, *without lucid intervals,* for the space of one year and upwards prior to May 10, 1847." As to the respondent, the inquisition is

[In re Gangwere's Estate.]

conclusive: 4 *Rawle* 239. Like a legal presumption, it operates till it is overpowered: 6 *Barr* 378. No witness disproves it. The persons who testify to its destruction were her daughter and the husband of her grand-daughter.

That the getting the paper into their possession for cancellation was not sufficient, its actual cancellation or destruction was necessary: 7 *Barr* 100; *id.* 251; 8 *id.* 286. The paper, after being obtained, was preserved within reach of both parties for seventeen or eighteen years, and their intention was abandoned.

As to the objection that the contract was void on account of being executed on *Sunday*. Marriage is a civil contract: 6 *Bin.* 405; 2 *Watts* 10, 11; and though solemnized on Sunday, is valid. It does not come within the spirit of the act of 1794, imposing a penalty for performing " any worldly employment or business whatsoever on the Lord's day." A recovery may be had on the consideration of a note executed on *Sunday*, if the consideration arose on *Saturday*: 6 *Watts* 232; 4 *W. & Ser.* 547.

The contract was valid, because the whole was an entire contract, the settlement entering into and forming a part of the consideration of marriage: *Story on Con.* sec. 22; 17 *Ser. & R.* 70. It must be rescinded in toto, or not at all: *Story*, sec. 25; *Reeve's Dom. Rel.* 174; *Atherly* 28, 42, 49.

*Porter* and *King*, for appellee.—In the answer of the respondent, she avers that there never has been a marriage contract. That on Sunday morning, the day of her marriage with Henry Gangwere, he told her that his sons were howling about the marriage; that he wished her to sign a paper which he could show to them to pacify them, and after having shown it to them he would destroy it. That, relying on this promise, she signed a paper which was presented to her, and that then they went and were married. That afterwards the deceased obtained the paper from Beitel for the purpose of destroying the same. That he took it home, and destroyed the same by putting it in the fire, the date of doing which she cannot recollect. This is verified by affidavit. The denials are not so verified. That the testimony proves the facts set forth in the answer. 1. Was a legal marriage contract executed? It was argued that the act of 22d April, 1794, rendered it void: 4 *Ser. & R.* 159; 4 *Dal.* 298; 4 *Yeates* 24; 6 *Bin.* 321. Though it is said that a bond given on Sunday is void by the statute and not by the common law: 3 *W. & Ser.* 444; 1 *Taunton* 135, opinion of Lord MANS-FIELD; yet it was contended that the opinion at this day seems to be that contracts made on Sunday are void by the common law, for Christianity is part of the common law: *Broome's Legal Maxims* 19; 40 *Law. Lib.* The judges cannot sit on Sunday: *id.* and *Co. Litt.* 135; 4 *Bl. Com.* 63; *Dyer* 181.

But whether void at common law or not, the act of 1794 inter-

[In re Gangwere's Estate.]

dicts all contracts coming under the denomination of worldly business: 6 *Watts* 221; 2 *Barr* 451; 7 *id.* 492–9.

The contents of the contract were not proved, and equity will not decree specific execution of a contract, the terms of which are uncertain: 2 *Ball & Beatty* 451, Savage *v.* Carroll; 2 *id.* 369, Ormond *v.* Anderson; 2 *Schoal & Lef.* 549; *Prec. in Chan.* 538, Young *v.* Clark.

If a bond be delivered to be cancelled, but, not cancelled, come again into the hands of the obligee, though it is valid in law, the obligor will be relieved in equity : Cross *v.* Powell, *Cro. Eliz.* 483; 7 *Barr* 252–3.

As to the sanity—That the jurors who testified, said substantially that Mrs. Gangwere, when examined as a witness before the inquest, said that within the last two years she had seen something not right about him—at times he had his understanding, and at times not; and one of them added : "It was only occasionally that she thought she saw any thing wrong about him." But within a short time (some say she said six months) before we were there, she said he was childish, and not able to manage his affairs. · She was excited and alarmed when she testified, and seemed hardly to know what she did say.

The inquisition is only *prima facie* evidence : 4 *Rawle* 234; 6 *Barr* 373; 2 *Atk.* 412–13; *Collison* 389.

A marriage celebrated on Sunday is valid. When it is said to be a civil contract, it is meant that it is not a matter for ecclesiastical jurisdiction, and need not be celebrated by an ecclesiastic. It is cognizable in our courts of law. In England it is not so. The jurisdiction there is in the ecclesiastical courts. Even the divorce for adultery, cruelty, &c., is decreed by the spiritual court, and is only a *mensa et thoro*, leaving the marriage contract still existing. In Protestant countries, marriage is not considered a sacrament, but a contract; yet, unlike all other contracts, it is one which the parties themselves cannot rescind or dissolve. We, following the Scottish law, treat it as a contract of this nature, and have given our courts of common law jurisdiction to dissolve the marriage contract for certain reasons, without bastardizing the issue.

Marriage is a contract civil and divine : 1 *MacQueen on Husband and Wife*, p. 1, (49 *Law Lib.*,) and this is the light in which we view it.

The opinion of the court was delivered by

Rogers, J.—As the deceased, Henry Gangwere, died intestate, Jacobina Gangwere, his widow, under the intestate laws, is entitled to the one-third of the personal absolutely, and the one-third of the real estate during life. This is not disputed; and if there was nothing else in the case, the distribution of the estate would be at-

[In re Gangwere's Estate.]

tended with little difficulty. But the heirs of the intestate contend she is not entitled to any portion in the distribution, because, before or at the time of the marriage, the parties entered into a marriage contract. To defeat the widow's right of dower, which is favored by the law, three things must be clearly proven: the existence of the marriage contract, its loss or destruction, and the contents. That a marriage contract was entered into between the parties, we have no reason to doubt, as there is proof of the fact by the witnesses examined on the part of the appellant and appellee. They prove repeated declarations to that effect, not only by Henry Gangwere, but by his wife also. The marriage settlement seems to have been made for the purpose of quieting the minds of the children of the intestate by a former wife, who, as is usual in such cases, made a violent opposition to the second marriage. There is reason to believe that, without that, no contract would have been made; the marriage would have been suffered to take its usual course. This was the reason assigned by the husband to his intended wife, and there is some ground to believe it was designed for no other purpose whatever: that it was the understanding when this design was answered the agreement should be cancelled, or that compensation should be made to her, if she survived, by a will afterwards to be made. Hence it is that we find that, after the contract had remained in the possession of Christian F. Beitel, the trustee, a year and a half or more, the old man, as he testifies, came to him and wanted the paper to destroy it. He was quite out of humor because Mr. B. would not give it to him. He told him he must bring his wife along, as he could not give it up without all the parties were present. After some time, the old man and his wife came and demanded the paper again. He gave it to them, and they, at the time he delivered it to them, declared it to be null and void. It was declared null and void, as he says, at the time the witness delivered it. The conversation was in German, the literal translation of the expressions used is, as the witness says, that it shall be given up. This testimony there is nothing to contradict, and, coming from a respectable witness, I shall take it to be true. It amounts, in my opinion, to a declaration, by both parties, that the marriage contract should be of no effect between them. That the agreement was not actually destroyed and cancelled at the time, evinced by the repeated declarations of the old man and his wife, amounts to but little, if, as I am inclined to believe, the original motive for entering into it was to quiet the fears of the children, who, as the old man said, were howling about his marriage, and would continue to do so if they were led to believe the marriage settlement had been cancelled and destroyed. To avoid unpleasant scenes in the family, may and in all probability was the real cause the contract was not actually cancelled and destroyed. The provision for the wife, according to the

[In re Gangwere's Estate.]

representations of the witnesses, was so inadequate, that we can with difficulty believe she would have submitted to it, or that he would have been so ungenerous and unreasonable as to exact it, unless there was an understanding it should be considered as of no efficacy, or that a will should be made making up to her any deficiency in the marriage settlement. If, then, the instrument was delivered up by the trustee to the parties, at their request, and at the time of delivery they declared it should be null and void, or words of equivalent import were used, as that it shall be given up, that would be perhaps equivalent to a cancellation or destruction of the paper itself. The intention of the parties alone is to be considered; not the mode adopted to signify that intent. Campbell's Estate, 7 *Barr* 101, is to this point. It is said that the trustee had no right to deliver up the paper to be cancelled, and that the assent of the wife does not bind her. That both must be bound or neither. But not so, if, although she is not bound, the husband is. As the wife, since his death, has ratified the acts of the parties, there is no objection on that account. The intention of the alleged article of agreement was (according to the testimony) to limit the rights of the feme. C. F. Beitel was named as trustee. There is no positive evidence that the paper was under seal, and it may be the delivery or surrender of such a paper to be cancelled is, in equity, to be considered equal to a cancellation. But whether this was such a delivery of possession as amounts to a cancellation of the paper, without more, according to the case of Cross *v.* Powell, *Cro. Eliz.* 483, recognised in Campbell's Estate, 7 *Barr* 101, it is unnecessary to consider, as it is agreed that if it was delivered up to be cancelled, and was cancelled, the instrument cannot be enforced as a valid settlement. Whether it was cancelled or destroyed, will be examined in another part of this opinion.

As has been before said, it is necessary for the sons to prove the existence of the paper, its destruction, and afterwards its contents. That such a paper existed at one time, has been fully proved; it is also equally certain it has been destroyed; and the next question is, have the contents of the paper been legally proved. On this point, the law is well settled: the rule is, that the contents of a lost paper must be so proved as that the court can say, with something approximating to certainty, what it contains. When a party has failed to prove the terms of the agreement he relies on, equity will not assist him, by directing an issue to ascertain the terms. If he be plaintiff, it is incumbent on him to state in his bill the agreement of which he calls on the court to decree performance, and to prove the agreement as stated: Savage *v.* Carroll, 2 *Ball & Beatty* 451; Ormond *v.* Anderson, 2 *Ball & Beatty* 368.

Equity will not decree the specific execution of a contract the terms of which are uncertain as to its extent: Harnet *v.* Yielding, 2 *Schoal & Lefr.* 549. And again, equity will not decree the spe-

[In re Gangwere's Estate.]

cific execution of articles of agreement, when they appear to be unreasonable or founded on fraud: Young *v.* Clark, *Prec. in Chan.* 538.

In addition to the authorities cited, it may be added, that chancery will not decree specific performance, without proof of the whole contents of the instrument. Evidence of part will not suffice, and particularly a marriage contract, where the words used by the parties (see Ellmaker's Estate, 4 *Watts* 89) are so important as regards the rights of the feme. In this case, proof of the contents is singularly meagre and uncertain. There is not a single witness who undertakes to give the whole contents of the contract. What sum she was to receive, whether 100, 125, 200, or 300 dollars, we are not informed; whether that sum was in gross, or to be paid to her annually, we know not; nor do we know (which is very important to her rights) what she relinquished in consideration of the settlement, whether her right to dower, her right to the personalty in case of intestacy, or her right to both. On these important matters, we are left entirely in the dark. There is nothing proven on which equity could found a decree. But, notwithstanding this radical defect in the appellant's proof, I grant if they have shown that the marriage contract was fraudulently destroyed by the appellee herself, equity will not make any intendment against him. Equity will not brook that a party shall take advantage of his own wrong. And this leads to the inquiry as to the loss of the paper, and the persons by whom it was destroyed. That the contract is not now in existence, seems to be put beyond all doubt. Indeed, this seems to be taken as a conceded fact by both parties. But, although destroyed, the appellants allege it was fraudulently destroyed by the appellee or by her connivance; that, although it may have been in the presence of her husband, and with his assent, he was in such a condition of mental imbecility as to be incapable of giving any validity to it. The allegation of the appellants, it is vain to deny, amounts to a direct charge of perjury against two witnesses, and of combination and fraud between these witnesses and the appellee. To sustain such a charge, requires clear and stringent proof. The witnesses to whom I allude are Catherine Phleuger and David Young, who prove that the paper was actually destroyed by Henry Gangwere himself. The old woman refused to destroy it, and then, as the witnesses say, he put it in the stove and burnt it himself. That this was the marriage contract, we have no reason to doubt. It was said by one of them, but which the witness does not recollect, it was the writing they had with each other; and it is very certain, they had no contract except the marriage contract. Catharine Phleuger testifies, the old man said the paper (referring to the paper burnt) was the agreement they had made together when they were married. I do not lay much stress on the fact that Catharine Phleuger was mistaken, admitting she was so, in the

[In re Gangwere's Estate.]

time this transaction took place. There is nothing so difficult to recollect, and in which witnesses are so liable to mistake as in dates, and to stamp them with the charge of perjury for that reason, would be most perilous. If we suppose the transaction to which the witness testifies took place after the time the money was counted, there is next to nothing to throw a shade of suspicion on the evidence given by those witnesses. We should not be warranted in disbelieving them merely because of their connection with the appellee, one being married to her son, the other to her granddaughter. These are circumstances to be weighed in a doubtful case, but ought not to be allowed to shake our credit altogether in witnesses who swear positively to the fact and are otherwise unimpeached.

Taking it, then, for granted that the contract was destroyed, in manner described by them, the next inquiry is, was Henry Gangwere in a condition to assent to its destruction? It is alleged that at the time he was a lunatic. In proof of this, the appellants rely on a petition or commission of lunacy, which was presented at the May term, 1847, the inquisition held the 10th May, 1847, finding him of unsound mind, &c., and that he hath been in the same state for the term of one year, last past, and upwards. This, it will be observed, overreaches the time testified to, when the contract was destroyed. The petition, it appears, was presented by the appellee, and she was examined as a witness. Some of the jurors have testified as to what she swore on that occasion. As was natural to expect, they have given entirely different versions of it. This, coupled with the fact that she was very much alarmed and confused, will prevent me from paying much attention to this part of the evidence, except in stating, that it rather tends to show that he was not entirely bereft of understanding: it evinces, what is very important in this inquiry, that he had lucid intervals. Great reliance is placed on the fact that the commission of lunacy overreaches the time of the alleged burning of the will. This, undoubtedly, is entitled to great weight; but it is well settled that instruments executed or acts done by a lunatic, in a lucid interval, are binding, even if afterwards overreached. It is *prima facie*, but not conclusive evidence, as is ruled in Hutchinson *v.* Sandt, 4 *Rawle* 234; Rogers *v.* Walker, 6 *Barr* 373; 2 *Atk.* 412–13, Sergeson *v.* Sealy; *Collison* 389, sec. 1, 2, 3. The inquisition in this case was no more binding on Mrs. Gangwere, although a petitioner and witness, than on a stranger. She is not estopped from asserting the truth, as is in effect ruled in Hutchinson *v.* Sandt, 4 *Rawle* 234, where it is held that one of the inquest himself was not estopped. It was ruled to be persuasive evidence only. The testimony adduced on both sides, whilst it shows clearly a general imbecility of mind, also as clearly proves that Henry Gangwere had lucid intervals. The evidence on that point is irresistible. In addition to the whole

current of the evidence, the testimony of Jacob Correll and Wittman, who testify as to what took place the 26th Sept., 1846, when they went to count the old man's money, is conclusive. "We talked very little to him; but what we talked to him, he answered correctly." When we counted the money, the witness saw nothing wrong in him. He was in a low, weak state. What little questions we put to him, he answered sensibly. He was sitting up. He directed me where to find the money in his tenant's house. He told us there was a small trunk in a chest, in the garret in his tenant's house. That there was about $1200 there.—We went and got it, and found it there, and counted it, and it overrun a little, $10, $12, or $14. Mr. Wittman says, when they counted the money, the old man was sensible, very sensible. I had a conversation with the old man. He told me things about my uncle, which I knew to be true. He talked about his younger days.—If this testimony is to be taken as true, and there is no reason to doubt it, the old man had the possession of his mental faculties at that time. Any act of his then would have been good, notwithstanding the commission. The proof of a lucid interval would be most clear. This, be it observed, was about the time testified to by Catharine Phleuger and David Young, when the contract was burnt. Catharine Phleuger, after giving a clear statement of what was said and done by the old man and his wife, says, "What he talked to me, he talked understandingly." David Young, in answer to a question put to him, says, "He had his understanding, as much as I could see. He talked like a man having his understanding, as he had done before we knew there was any thing out of the way with him." From the testimony taken together, the evidence is clear, that at times, although his understanding had been impaired by age, and considerable imbecility of mind existed, yet he had lucid intervals, and it is proved, by two witnesses, that when the contract was destroyed, it was destroyed by himself, in pursuance of a resolution long before taken, and prevented from being carried into effect by the delicacy of his wife; and that, at the time, he had an understanding sufficiently clear to enable him to do any valid act in the disposition of his property, and particularly in relation to an obligation or act of duty which he conceived himself bound in conscience to perform.

I am unwilling to believe that the old lady, who has shown, as is proved, singular integrity and delicacy of mind and sense of propriety, in relation to her husband and his children, should have been guilty of subornation of perjury and wicked combination to cheat and defraud. At any rate, the testimony is not so clear as to justify us in putting a decision on a point on which this must be assumed as its groundwork. It is impossible to rule this case in favour of the appellants, on any other hypothesis.

It will be remarked that this decision goes on the assumption that the marriage contract was legal, though executed on Sunday.

[In re Gangwere's Estate.]

The  court  gives  no  opinion  on  that  point,  because,  being  equally
divided,  we  were  unable  to  come  to  any  conclusion  on  this  part
of  the  case.

Decree  of  the  Orphans'  Court  affirmed.