CINCINNATUS M. LUCAS, plaintiff in error, *vs.* JAMES M. PARSONS and PEGGY LUCAS, defendants in error.

L. L., a resident of Crawford county, was, by inquisition in that county, found a lunatic. Afterwards, he moved to Monroe county, and there died. In the latter county, a paper was propounded as his will, and there was a caveat; and an application for letters *pendente lite;* and a caveat to that on the ground, that L. L's act of removal, was the act of a lunatic, and therefore void.

*Held,* That the finding in the inquisition, was not *conclusive,* to show, that L. L. was a lunatic at the time of his removal.

Apeal from Ordinary, granting letters of administration *pendente lite,* in Monroe Superior Court. Tried before Judge CABINESS, at February Term, 1857.

Littleberry Lucas, an old man about seventy years of age, residing in the county of Crawford, and owning a very large estate, was, after inquisition, declared and adjudged by the Ordinary of said county, a lunatic, at July Term, 1854; and his son Cincinnatus, upon whose petition the commission of lunacy issued, was appointed his guardian.

The family of said lunatic consisted of his wife, Peggy Lucas, and three children; the said Cincinnatus, Mrs. Parsons, wife of James M. Parsons, and Mrs. Holstein, wife of Elzy Holstein. He had plantations in the counties of Crawford, Taylor and Monroe.

After the inquisition, and the appointment of Cincinnatus

as guardian, said lunatic left the county of Crawford, and with his wife, removed to the county of Monroe, where he remained until his death, which took place in August, 1856.

There was no evidence that the guardian consented to this removal; on the contrary, he alleged and made complaint to the Ordinary of Crawford country, that he had been unlawfully removed by Parsons and Holstein.

On the 2d April, 1855, after his removal to Monroe county, the said Littleberry, duly made his last will and testament, revoking a former will, made by him 7th July, 1845.

After the death of the said Littleberry, his son Cincinnatus propounded for probate, before the Ordinary of Crawford county, at September Term, 1856, the will of 1845. The widow, Parsons and Holstein, entered their caveat to the proof of this will on two grounds:

1st. Because the deceased was a citizen of Monroe county at the time of his death, and the Court of Ordinary of Crawford county had no jurisdiction.

2d. Because said paper was not the last will and testament of deceased, but had been revoked by a subsequent will.

The Ordinary sustained the first ground, and refused to admit the will to probate and record.

From this decision the propounder, Cincinnatus M. Lucas appealed, and the appeal is now pending in Crawford Superior Court.

At the September Term, 1856, of the Court of Ordinary of Monroe county, Mrs. Peggy Lucas, the widow of deceased, and James M. Parsons, propounded the will of 1855 for probate, to which Cincinnatus M. Lucas entered his caveat.

The Ordinary sustained the will, and admitted it to probate, and caveator appealed.

Application was then made by propounders, for letters of administration *pendente lite.* This application was resisted by caveator, on the grounds,

1st. Because the estate of deceased was in his hands, as guardian, and amply secured by his bond.

2d. Because the Court of Ordinary of Monroe county, has no jurisdiction to grant letters of administration *pendente lite.*

3d. Because one of the applicants, Mrs. Lucas, can neither read nor write, which renders her incompetent.

4th. Because, if administration is necessary, and the Court should have jurisdiction, then that caveator, Cincinnatus M. Lucas, is entitled to the letters, in preference to applicants.

The Ordinary overruled all the objections, and granted letters *pendente lite* to the applicants, Mrs. Lucas, the widow, and Parsons, the son-in-law.

From this decision Cincinnatus M. Lucas appealed to the Superior Court, and upon trial there, under the testimony and charge of the Court, the jury found in favor of appellees.

Whereupon, counsel for appellant moved for a new trial on the following grounds :

1st. Because the Court erred in charging the jury, that there was a necessity for an administration, under the circumstances of the case ; because, upon the death of Littleberry Lucas, caveator's letters of guardianship abated, and he was no longer bound, and his sureties were not liable, after the death of Littleberry Lucas, for any act or acts of their principal, and new bond should be given for the estate ; but no new bond could be legally given, but upon the granting the letters *pendente lite.*

2d. Because the Court erred in charging the jury, that if Cincinnatus Lucas had taken charge of the person of Littleberry Lucas, upon his appointment as guardian, and carried him to his own house; then his residence became the residence of the lunatic, and he could not change his residence without the consent of his guardian, but if the guardian permitted him to reside with his family, then the permanent residence of his family was his residence, and if the family changed their residence, then the place of the permanent residence of his family was the place of his residence, and that, if Littleberry Lucas' family resided in Monroe at the time

of his death, then that was his residence, and the Ordinary of Monroe county had jurisdiction to grant the letters of administration.

3d. In charging the jury, "that the rule in granting administration, is the same which obtains in the distribution of property. The nearest relations are first entitled, and the applicants and the caveator, in this case, being in equal degree, as to distribution, are equal, so far as their legal rights to the administration are concerned; but if the caveator denied any necessity for an administration *pendente lite*, in this case, that fact, coupled with the fact, if it existed, of the applicants owning and representing a larger interest in the estate than the caveator, should give them a preference over him.

4th. Because the Court erred in refusing to charge, in the language of the written request of caveator's counsel, "That while the inquisition of lunacy remained unrevoked, the lunatic was incapable of performing any act; and any act done by him during that period, is absolutely and conclusively void and of no effect." And in charging, in lieu thereof, "if Littleberry Lucas had a lucid interval, he was competent to change his residence."

5th. Because the Court erred in refusing to charge, in the language contained in the written request of caveator's counsel, " that the inquisition of lunacy, at the time it was taken, fixed the residence of Littleberry Lucas in the county of Crawford, and in legal contemplation, he continued to reside there during the continuance of the commission, and until the inquisition was revoked; for, that a lunatic, under commission cannot change his residence without consent of his guardian, *express* or *implied*, or unless he acts during a lucid interval; and it is incumbent on the party claiming the act to have been done during a lucid interval, to establish that fact by clear and irrefragible testimony, excluding all reasonable doubt as to the state of the lunatic's mind at the time of the act." And in charging, in lieu thereof,

" while the deceased remained a lunatic, he could not change his residence; but if he was restored to sanity, he had the power to change his residence; but the evidence should show the restoration to sanity beyond a doubt; at least, it should be such as to satisfy the minds of the jury."

6th. In refusing to charge, in the language as requested in writing by caveator's counsel, " that in determining whether a declared lunatic was restored to sanity at the time the alleged act was done, the jury are to look to the state of feeling and mode of thinking usual to the individual when sane, and if there is a prolonged departure from such modes of thinking and feeling, then the individual is insane, and unless, at the time of the alleged lucid interval, the state of feeling and modes of thinking are such as are usual to the individual while in a healthy state of mind, he cannot be said to enjoy such lucid interval." And in charging, in lieu thereof, " that the jury are to judge from the testimony, whether Littleberry Lucas was restored to sanity."

7th. In refusing to charge, in the language requested in writing by caveator's counsel, "if the lunatic converses intelligently and rationally, at the time of the alleged lucid interval, on those subjects upon which he is most deranged, then the jury may consider the lucid interval as established; but if not, it is otherwise, and the mere fact that he converses intelligently and rationally upon indifferent subjects, affords no sufficient evidence of his restoration to sanity." And in charging, in lieu thereof, " that it was the province of the jury to determine, from the evidence, whether the deceased conversed intelligently and rationally, and was restored to sanity."

8th. In refusing to charge, in the words and language requested by caveator's counsel in writing, " that in determining the domicile, two things must concur, viz: actual residence and intention. And intention cannot be imputed to a lunatic under commission, unless it be clearly and conclusively shown, that he was sane at the time the alleged act

was done, and if sane at the time, the intention to make it his permanent residence, must be evidenced by acts." And in charging, in lieu thereof, " that the rule established by the statute of Georgia, in relation to residence, was, that a man's residence was to be considered to be where his family permanently resides, and no declaration of intention was required by the statute. The residence of Littleberry Lucas was where his family permanently resided, and no declaration of intention was necessary to constitute residence."

9th. In refusing to charge, as requested, " that if Cincinnatus M. Lucas stands in an equal degree of relationship to the said Littleberry Lucas with the applicants, and has the property in possession, it should not be taken from him and placed in the hands of the other litigants, but the letters of administration, if granted at all, should be granted to him." And in charging, in lieu thereof, " that on the death of Little-berry Lucas, Cincinnatus M. Lucas' letters of guardianship abated, and the bare fact of his, (C. M. Lucas) being in possession of the property, gives him no preference in law over the applicants, to the administration."

10th. Also refusing to charge, as requested, " that especially is Cincinnatus M. Lucas entitled, under the foregoing circumstances, to the administration, unless it is shown that the property is in jeopardy, and that Cincinnatus M. Lucas is irresponsible, or refuses or neglects to furnish adequate reasonable security; and the jury is not to presume that the property is in jeopardy, or that Cincinnatus M. Lucas is irresponsible, or refuses or neglects to furnish adequate reasonable security; but these are facts the applicants are bound to prove." And in charging, in lieu thereof, " that on Littleberry Lucas' death, the letters of guardianship of C. M. Lucas abated, and though his bond was binding and good up to that time, yet his securities were not bound for his acts in the management of the property after his letters abated, and he could not legally give any bond, nor could any bond be legally required of him for the safe-keeping and forth-

coming of the property, but upon granting administration *pendente lite.*"

11th. Also refusing, to charge as requested, " that when the applicants for the administration are in equal degree to the deceased, that one is to be preferred who, in the opinion of the jury, is most competent to manage and take care of the estate." And in charging, in lieu thereof, "if either of the applicants is incompetent, he should be rejected, and this the jury are to determine from the evidence."

12th. In refusing to charge, as requested by caveator's counsel, " that inability to write was evidence of incompetency." And in charging, in lieu thereof, " that in law, the fact of a person being unable to write his name, is not a ground of incompetency."

13th. In refusing to charge, as requested by caveator's counsel, " that if the applicants and C. M. Lucas stood in equal degree of relationship to deceased, he was legally entitled to be joined with them in the administration." And in charging, in lieu thereof, " that they could not find for the applicants and C. M. Lucas, but must find for C. M. Lucas or the applicants."

14th. That the verdict of the jury is contrary to law.

15th. That the verdict is decidedly and strongly against the weight of evidence, and without evidence to support it.

Wherefore, and for divers other errors apparent in the proceedings had in said cause, the said caveator prays the Court to grant him a *rule nisi*, calling upon the applicants to show cause so soon thereafter as counsel can be heard, why said verdict should not be set aside, and a new trial granted upon the grounds aforesaid, and counsel for caveator herewith present a brief of the oral, and copy of the written, testimony in said cause, for approval.

                              G. P. CULVERHOUSE,
                              S. R. HUNTER,
                              MILLER & HALL,
                                *Attorneys for Caveators.*

The Court overruled all the grounds, and refused the mo-
tion for a new trial. And to this decision counsel for Cin-
cinnatus M. Lucas excepts.

There was a mass of testimony introduced *on both* sides,
as to the state of testator's mind, from the time of the inqui-
sition of lunacy, up to the period of his death, his lucid in-
tervals and restoration to sanity; but as no point is made or
decided upon it, save the ground taken for a new trial—that
the verdict was against its weight—it is deemed unnecessa-
ry to insert it.

The charges of the Court, and its refusals to charge, will
be seen and fully understood in the recitals contained in the
grounds for a new trial.

CULVERHOUSE; HUNTER; and HALL, for plaintiff in error.

TRIPPE; NORMAN; POE & GRIER, for defendants in error.

*By the Court.*—BENNING, J. delivering the opinion.

Littleberry Lucas died leaving a writing which was offer-
ed for probate, as his will, in the Court of Ordinary of Mon-
roe county, by Peggy Lucas his widow, and James M. Par-
sons, one of his sons-in-law. His son, Cincinnatus M. Lu-
cas, filed a caveat to the admission of the writing to record,
as a will. Thereupon, Peggy Lucas and James M. Parsons,
applied for letters of administration, *pendente lite.* To this
application, Cincinnatus M. Lucas filed four objections,
These were overruled by the Court of Ordinary; and he ap-
pealed to the Superior Court. In the Superior Court, the
the jury also overruled the objections, and found a verdic.
for Peggy Lucas and James M. Parsons.

Cincinnatus M. Lucas then moved for a new trial, and as-
signed a great number of grounds for the motion. Of these
grounds, all but two, related to the charge of the Court.

But there is nothing in the bill of exceptions to show, what it was, that the Court charged, or, that the Court refused to charge.

The motion for the new trial recites certain things, as those which the Court charged and refused to charge; but the motion was the mere act of the movant, and its recitals do not prove themselves.

These grounds relating to the charge, were, consequently, rejected from the bill of exceptions, on the motion of the counsel for the defendant in error.

These being rejected from the bill of exceptions, but, two remained; these were

1st, That the verdict was contrary to law.

2dly, That the verdict was decidedly and strongly against the weight of the evidence, and without evidence to support it.

The question therefore is, was either of these grounds good?

It is obvious, that neither could be good, unless some one of the objections to the issuing of the letters, was good in law, and was proved in fact, to the extent of having the weight of the evidence, decidedly and strongly, in its favor.

Let us, then, go to the objections.

Of these, the second, was the important one; and to that, we will go first.

The second was, that "Littleberry Lucas' domicil was, in legal contemplation, in Crawford county, although he died in Monroe;" and that, therefore, the Court, (being the Court of Ordinary of Monroe,) had no jurisdiction of the case.

This objection, if true in fact, was, no doubt, good in law. Was it, then, true in fact?

Littleberry Lucas, a short time before his death, moved from Crawford county into Monroe county. And the case was such, that, if at the time of the removal, he was a lunatic, then, it was true in fact, that the Court in Monroe had no jurisdiction; but, if at that time, he was not a lunatic,

then, it was not true in fact, that the Court in Monroe had no jurisdiction.

The question, therefore, becomes this, was he a lunatic, at the time of his removal from Crawford to Monroe?

Much evidence on this question, was submitted by both sides.

Amongst the evidence submitted by C. M. Lucas, was the record of an inquisition of lunacy, taken in Crawford county.

From that record it appeared that the inquisition was founded on a petition of C. M. Lucas, that Peggy Lucas, and James M. Parsons had notice of the inquisition; that the commission after reciting, that it had been represented to the " Court by the petition of Cincinnatus M. Lucas, that Littleberry Lucas" was " a lunatic idiot from age and imbecility," —" authorized" the commissioners, " to examine by inspection said Littleberry Lucas as to his alleged lunacy, idiocy, &c., and, to examine witnesses as to the alleged fact," and to make their " return" to the Court; that the commissioners on the 30th of June 1854, made the following " report" to the Court: " We find the said Littleberry Lucas, an insane lunatic from age and disease, and incapable of managing his own affairs," and that, thereupon, the Court at July Term, 1854, appointed a person, guardian for Littleberry Lucas, which person was C. M. Lucas.

Littleberry Lucas's act of removal from Crawford to Monroe, was after this appointment, was sometime in the early part of 1856.

This being so, the counsel for C. M. Lucas, insist, first, that this verdict was to be considered as *conclusive* proof of their position, that Littleberry Lucas was, at the time of the act of removal, a lunatic; secondly, that, if it was not, yet, that " the weight" of all the evidence, was " decidedly and strongly" in favor of the position.

First then, it is true, that the verdict was to be considered as *conclusive* proof, that Littleberry Lucas was a lunatic at the time of his removal from Crawford to Monroe.

Lucas vs. Parsons and Lucas.

It is a general principle, that a judgment is conclusive proof as between the parties to it, concerning the *matters in issue*, in the case in which the judgment is rendered; but is not conclusive, or, indeed, any proof, concerning other matters. This is a principle that applies to all judgments of all Courts. It is a principle as well settled perhaps, as any in the law.

There is nothing in the law, as far as I know, that makes a judgment in an inquisition of lunacy, an exception to this principle.

If then this principle is to govern in the present case, the judgment in question, was conclusive proof as to all the matters that were in issue before the commissioners, and, as to no others.

What matters then, were they that were in issue, before the commissioners? Certainly, those which the commissioners were authorized by the commission to inquire into, and no others.

The commissioners were authorised by the commission to inquire into the matter, whether Littleberry Lucas was a lunatic, as it was "alleged" that he was; that is, to inquire whether his *condition at the time of the making of the inquiry*, was that of a lunatic. They were not authorized to inquire as to whether his condition at any *subsequent* time to that, would, or would not, be that of a lunatic.

And the commissioners, in making the inquiry, did not exceed their authority. Their finding was in the present tense only. They said, "we find the said Littleberry Lucas an insane lunatic." That is, "we find Littleberry Lucas *to be* an insane lunatic." Not, also, we find, that he *will be* one *next month* or *next year*.

The matter, then, and the only matter, that was in issue before the commissioners, and that was considered by the commissioners, was, whether the condition of Lucas at *the time of their inquiry*, was that of a lunatic or not; the matter whether his condition would not be that of a lunatic at any sub-

sequent time to that, was not before them; nor was it by them considered.

It follows, then, that if the general principle, that a judgment is *conclusive* only as to such matters as are in issue, is to govern, that the judgment or finding of the commissioners in this case, was not conclusive, or even any evidence at all as to what would be the condition of Lucas as to sanity, at any time subsequent to the judgment or finding.

Does it follow, then, that, if this be true, the judgment or finding is something that cannot be used at all as evidence, on the question, whether Lucas was not in a condition of lunacy, at some time subsequent to the judgment or finding? By no means. The judgment may still be used as evidence of the first importance on that question. Why? Because the *fact* found by the judgment, is evidence of the first importance on that question; and the judgment is the only thing that can be evidence of the fact found by the judgment. The fact found by the judgment, is, that Lucas, at *the time of the judgment*, was a lunatic. This *fact* is evidence of the first importance, on the question, whether or not, he was a lunatic at any subsequent time—because of the judgment? no; but because the *law* says, that when a man is shown to be in a condition of sanity or insanity, at any particular time, *it shall be presumed, that he remains in that condition, until it is shown, that he is in it no longer. Shel. Lun.* 290. The judgment is the only thing, through which we can *conclusively* get this *fact*. If there was any thing else through which, we could conclusively get the fact, it must be manifest, I think, that that thing would be worth, just as much as the judgment, on the question of sanity or insanity at the future time. For example, suppose the law were, that the opinion of a man's family physician should be *conclusive* on the question of his sanity or insanity; and, that, in this case, Lucas's family physician had, on the same day on which this judgment was made, pronounced the opinion, that Lucas was insane; now, supposing this, then, I say, that

it seems manifest to me, that this opinion would, on any question, as to Lucas's future sanity or insanity, be worth just what this judgment would be worth on any such question.

This fact, viz., that Lucas was insane, at the time of the judgment, was all that the judgment gave us; whether he would still be so, or not, at the time of his removal to Monroe, was what the judgment *could not* give us. The judgment was the act of man, and man knows not what a day may bring forth.

What then is the result? This; that this judgment is conclusive evidence of *the fact*, that Lucas was insane at *the time the judgment was made*, and of that fact only; and, that, *that fact* is *strong*, but not *conclusive* evidence, that Lucas was *still* insane at the time of his removal.

This is the conclusion, then, to which we must come, if we consider the case to be governed by that well settled principle, that a judgment is conclusive of the matters in issue, but, of no others.

Again, it would seem to follow, that if a judgment of this sort is conclusive, to show the person, the subject of it, insane, when the question concerns an act of one kind, it would have to be equally conclusive to show the person insane, when the question concerned an act of any kind. But it is admitted that this is not so. It is admitted, that such a judgment is not conclusive, to show the person insane, when the question concerns an act of marriage, an act of testamentation or an act of crime. And acts of these kinds are of the very highest importance, and of not unfrequent occurrence.

To say, that such a judgment is not conclusive, when the question concerns any acts of these kinds, and is conclusive, when the question concerns any act of any other kind, is to say what may easily lead to great absurdity. Suppose this case, a man is sued criminally, and also, sued civilly, for, say, the same assault and battery. He pleads in both cases, a judgment previously rendered, finding him a lunatic. Is it

not absurd to say, that in the civil suit, the judgment shall be conclusive evidence of his plea; in the criminal suit, not? Is it possible, to think that the men who pronounce such a judgment as this, on a person, conceive themselves to be saying—"we find, that if this person shall do any act that will be both a crime, and a private wrong, the act, so far as it may be an act that is a private wrong, will be, beyond question, the act of a lunatic; but the act so far as it may be an act that is a crime, will not be, beyond question, the act of a lunatic."

Thus far, then, what have we? We have these propositions: 1. That a judgment is conclusive of the matters in issue, and of no others. 2. That there is nothing making a judgment on an inquisition of lunacy, an exception to this rule. 3. That, in the inquisition under consideration, the question as to the *time* of the lunacy, was, whether Lucas was a lunatic at the *time of the judgment;* and not, whether he would not be still a lunatic at *a time,* after the judgment, viz. the time of his removal to Monroe. 4. That, it is, beyond dispute, true, that judgments in such inquisitions, are not conclusive, when the future act of the lunatic, in question, is a testamentary, a matrimonial, or a criminal act.

Why then can we not here conclude that this judgment was not *conclusive* proof that Lucas was insane, at the time of his removal to Monroe? It is said, that decisions prevent us; decisions aided by considerations of expediency. Is this so?

What then do *decisions* say?

Of decisions, Beverly's case is, I believe, the first, and the one by which all the rest, directly or indirectly, justify themselves.

"In a bill depending in the Court of requests, between Snow, plaintiff, and Beverly, defendant; the matter was, that Snow had made a bond to the defendant in 1000*l*, and in the said Court would be relieved, because at the time of the making of the said bond, he was *non compos mentis;* and

Lucas vs. Parsons and Lucas.

this term, I moved the Court of Kingsbench, to have a prohibition, to stay the said suit in the Court of Requests, because the matter was not determinable there. And upon this case, two points upon argument and on good consideration, were unanimously resolved *per tot. Cur?* 1. That every deed, feoffment or grant which any man *non compos mentis* makes, is avoidable, and yet shall not be avoided by himself, because it is a maxim in law, that no man of full age, shall be in any plea to be pleaded by him, received by the law to stultify himself, and disable his one person." " 2. It was resolved, that it being against an express maxim of the common law, that the party shall not disable himself, that he shall not have for it relief in any Court of equity, for that would be in subversion of a principle and ground in law." 4. *Coke* 124. This is the whole of the *case*, if what makes a case, are the facts of it, and the decision upon the facts.

And from what we here have of the case, we cannot tell, whether there had or had not, ever been any judgment in an inquisition of lunacy finding Snow a lunatic; and therefore, we cannot say—that the question, as to the conclusiveness of such a judgment to show Snow a lunatic when he made the bond, was ever before the Court; but from what we have here, we can say, that if the question was before the Court, then that the Court decided that the judgment not only was not *conclusive* that Snow was then a lunatic, but that neither it, nor any other evidence, was so much as admissible, to show that fact.

This case then considered, in its facts, and in the decision upon those facts, serves to prove anything else rather than, that a judgment of the kind in question, is conclusive to show the person, the subject of it, a lunatic at a time *subsequent* to the judgment.

But this case is accompanied by many observations of Lord Coke's own; and it is said, that some of these serve to prove this, if the case itself does not.

Is this true?

The observations relied upon, are to the effect, that all *alienations* of lands or goods, made by a lunatic, after "*office found,*" are void.

[1.] But this is not saying, that *other* acts than those of alienation, are void. There was a special reason why acts of alienation should be void. The prerogative act of 17 *Ed.* 2 *ch.* 10, gave to the King the custody of the lands and, (by *construction,*) the goods of a lunatic, and imposed upon the King the duty, of maintaining the lunatic and his family, out of them, and to that end, declared that they should in "no wise be alienated." The observations of Lord Coke are by way of comment on this statute.

[2.] Nor is this saying, that the finding on the inquest of office is *conclusive.* And that is the point.

On the contrary, there is enough to be found in these very observations themselves, as I think, to show that Lord Coke did not himself, consider such a finding conclusive; there certainly is elsewhere in the same book. Among these observations is this, that the alienee of the lunatic, could not, even after office found, be dispossessed by the King, until he had been sued by the King, in *scire facias.* What was the need of a *sci. fa.,* if the judgment in the inquest of office, was conclusive.

But in "the case of the Wardens and Commonalty of Sadlers," reported in this same fourth book, p. 956, Lord Coke says: "But yet as well a traverse, as a *monstr' de droit* was at the com. law as well concerning frnk. and inheritance, as chattels real, for in all cases where by the office land is not in the K.'s hands, nor the K. thereby in possession, but the K., by the office is only entitled to an action, and can't make a seizure without suit, there in a *scire facias* brought by the King in the nature of such action to which he is entitled, the party may upon the said *scire facias* appear and traverse the office at the common law, for the party is in possession, and upon the matter found for him shall not have any *amoveas*

*manus* because by the office nothing [was at the K.'s hands, but the K. shall be barred of his action."

· From all this it is plain I think, that Lord Coke did not in his aforesaid observations, in Beverly's case mean to be understood as saying, that the finding in an inquest of office is conclusive.

It is not true, then, that there is anything in these observations of Lord Coke, to sustain the position of the counsel for the plaintiff, that the judgment on the present inquisition, is conclusive.

If we pass from Beverly's case to other decisions, we find them, again and again saying, that such a judgment is not conclusive. I refer merely to two, *Segesson vs. Sealey*, 2 *Atk.* 412, *and Faulder vs. Silk*, 3 *Campb.* 126. See *Shelford on Lun.* 64, 260, 261, 223.

But, it was argued, that these cases counted for nothing, because in them, the act as to which the question was, was an act done *before* the judgment finding the lunacy, although done within the time covered by the judgment—the judgment being one, finding that the person was a lunatic at the time of the judgment, and for a specified time previously.

But, I say, that if the judgment is not conclusive as to such acts, much less ought it to be conclusive as to acts done *after* the judgment. Such acts, it does cover and does pass upon; acts done after the judgment, it does not cover, does not pass upon.

In every commission under the English law, it is expressly enjoined upon the commissioners, "to enquire" "whether" (A. B.) "is a lunatic," "and if so, from what time," &c. *Shel. Lun.* 630.

But indeed, that office was not conclusive, but was traversable, according to the English decisions does not admit of a doubt. Nay more also it was traversable not merely at common law but also by statute. *Com. Dig. Prerogative D.* 83, *D.* 84, *Traverse of office.*

The English decisions then do not seem to sanction the

position that the judgment in inquisitions of this sort is con-
clusive.   They are the decisions which we are bound to fol-
low when we are bound to follow any.   Them we have fol-
lowed already, in another case, in respect to this same inqui-
sition.   21 *Ga. R.* 447, *Field and Adams vs. Lucas.*   In that
case, we held the inquisition not conclusive.

There is a division among the American cases; but we
see, in such of those cases as maintain the judgment to be
conclusive, nothing to make us change our own decision.

As to the argument from expediency, there is, perhaps,
as much to be said, on the score of expediency, on one side
of the question, as on the other.

Hold the judgment conclusive, and you subject the com-
munity to greater chance of being cheated and defrauded by
the lunatic; hold the judgment not conclusive, and you sub-
ject the lunatic to greater chance of being cheated and de-
frauded by the community.   But when you say, as we do,
that the judgment finds a *fact* from which a very strong,
though not a conclusive presumption of lunacy arises, you
give the lunatic pretty good protection; better than that
which the law gives to the weak minded who yet, are not
quite at the stage of lunacy.   The *fact* which judgment finds
is, that the party is a lunatic at the time of the judgment.
The law, from this fact, presumes, strongly presumes, that he
will remain so.   Men will not be anxious to encounter this
presumption.   Here is reasonable protection for the lunatic.

[1.] Upon the whole, then, we think, that this inquisition
was not conclusive to show, that Littleberry Lucas, the sub-
ject of it, was a lunatic at the time of his removal from
Monroe to Crawford.

The next question is, was not the *"weight"* of all the evi-
dence, "decidedly and strongly" in favor of its being true,
that he was a lunatic at that time.   We think not.

It would be useless labor, to go into a detail of all the rea-
sons we have, for this opinion.   Suffice it to say first, that
the evidence going to show that Lucas was not a lunatic at

the time of his removal, applied to the time of his removal, a short time before, and a short time after; and that, of all the evidence going to show that he was a lunatic at that time, none applied to this period, but all of it to an earlier period. Secondly, that the will made by him, seems to have been, as natural, and as just, ("afficious") as it was possible for a will to be. Indeed, the will was but a *revocation* of a previous will, on the ground that it was unjust, and the expression of a wish, that his property should be distributed "under the laws of Georgia."

I proceed, then, to the other objections presented to the granting of the letters *pendente lite.*

Of these, the first was, that the property of the deceased, was in the hands of Cincinnatus M. Lucas under a bond with good sureties—the bond which he had given, as guardian.

The third was, that Peggy Lucas, one of the applicants for the letters, could neither read nor write.

The fourth and last was, that C. M. Lucas was himself, better entitled to the letters than the applicants, and that, if letters were to be granted, he applied for them.

[1.] One general remark may be made, as applicable to all of these grounds; they were all grounds, appealing, not to *law,* but, to the *discretion* of the Ordinary. The Ordinary had the *power* under the law to make the decision which he did make.

The Act of 1805, says, "but the said Court of Ordinary may pending such appeal," (such an appeal as there was in the present case,) "grant temporary letters to collect the estate of the deceased." *Cobb Dig.* 283. The old act had *"shall"* in place of *"may." Id.* 311.

So by the Act of 1789, the Court of Ordinary has power to grant letters to *any* of the distributees. There is nothing in the act, that restricts this power so, as to make it the duty of the Court, to grant the letters to one of the distributees, rather than another, nothing, that says, that inability in a distrib-

utee to read or write, shall disqualify him for receiving letters. *Id.* 305, 291.

We cannot say that we see anything in the case sufficient to show in the Ordinary an abuse of this discretion.

The defect then about these three objections is that they are not good in law.

The defect about the other was as we have seen that it was not good in fact.

The result is, that the verdict, in our opinion, was neither contrary to law, nor to the weight of the evidence.

Therefore we must affirm the judgment refusing the new trial.

Judgment affirmed.