Matthews, J.
James Matheson and others were indicted for robbery at the July term, 1932, and on the 22nd day of August, 1932, Jacob Epstein and Jacob Noiman appeared in open court and executed as sureties a bond for the appearance of James Matheson. At the same time Jacob Epstein executed an oath in writing that he owned certain described real estate in this county, that its value was not less than *325 $6410, and that it was unincumbered, except as to a mortgage of $2700, and that it was worth not less than $3700 over and above all debts, liabilities and claims against him, which oath was executed in accordance with Section 13435-4, General Code, as a justification of suretyship. Thereafter the case was set for trial on the 25th day of October, 1932, and the defendant being called, failed to appear and the sureties being called to produce the body of defendant, as they had agreed to do, and failing so to do, the court ordered the forfeiture of the bond. Thereafter, at the January term, 1933, notice to sureties was issued to appear before the court on or about the 25th day of January, 1933, at ten? A. M. and produce the body of James Matheson, or show cause why judgment and execution thereon should not be entered against said sureties for $2500.
The surety Jacob Epstein appeared and representation having been made to the court that he was then of unsound mind, a trustee for the suit was appointed, and the cause now comes on to be heard upon the notice to the surety aforesaid and the answer of the trustee to the suit, alleging that Jacob Epstein was of unsound mind on the date upon which he signed the bond.
There is no question raised as to the formal execution of the bond. The original record of the court was produced at the hearing and the execution of the bond by Jacob Epstein amply proven by testimony and substantially admitted by Jacob Epstein himself. There was also no question but what the conditions justifying the forfeiture of the bond existed, and that such condition, to wit, the failure of James Matheson to appear, continued to exist.
The only issue therefore was whether or not Jacob Epstein lacked mental capacity to enter into this contract with the state of Ohio. So far as the state of Ohio is concerned, it did not initiate the negotiations resulting in the execution of the bond. Jacob Epstein made the proposal or offer, and it was only after the state was satisfied by his affidavit of justification of suretyship that it accepted his offer, permitted him to execute the bond and released the defendant. There can therefore be no suggestion of undue influence on the part of the state, or on the part of *326 any one whose actions would be chargeable against the state. The evidence was limited to the one issue of mental capacity.
In the first place, counsel for Jacob Epstein relies on two adjudications of insanity of Jacob Epstein by the Probate Court of this county. These adjudications were made on December 2, 1897, and January 6, 1900, and so far as the records of the Probate Court show, there has been no restoration to sanity. Records of Longview Hospital, however, show that on March 8, 1900, he was removed from the hospital in an improved condition.
Now what is the effect of these adjudications of insanity? This question received consideration in the case of Bishop v. Bishop, 40 Ohio App. 493, and'the court there held that an adjudication of insanity was admissible as evidence of insanity at later time but was not conclusive thereof. On this subject the court, at page 497, said:
“In the absence of a statute to the contrary, the rule unquestionably is that an adjudication of insanity is admissible as evidence of insanity at a later time, although not conclusive. The adjudication raises a presumption of insanity, but this presumption is rebuttable. 32 Corpus Juris, 647, par. 228.
“One of the clearest and best reasoned decisions which we have seen on this question is the old case of Lucas v. Parsons, 23 Ga., 267. Littleberry Lucas had been adjudged insane in Crawford county, Georgia, and thereafter moved to Monroe county in that state, where he executed a will and died, and the question for decision in the case was whether he was a resident of the county to which he had removed, and whether by reason of his insanity his residence must be held to continue in the county in which he was adjudged insane. The court held that the judgment of lunacy was conclusive evidence of that fact at the time the judgment was rendered, and of that time only, and that it was not conclusive evidence that he was still insane at the time of his removal. In the present case, as in the one just cited, the insane person was not committed to an asylum, but to the care of relatives, and was at liberty to go, with their consent, wherever she wished. An extensive note on this question may be found in 7 A. L. R., 588, and it establishes that the presumption of insanity which continues after an adjudication of insanity is a rebuttable one.”
*327 So we reach the conclusion that these adjudications of insanity are not conclusive, and that in view of the fact that more than thiry years have elapsed since Jacob Epstein’s removal from the hospital, they are of very little probative force as to his mental condition at the time he executed this bond.
After he left Longview Hospital he engaged in business as an employe and by his own efforts accumulated the money with which the property was purchased which is described in his affidavit of justification. He executed the mortgage to the building association and regularly transacted the business with the building association of paying the dues and interest thereon. When he appeared in court to execute this bond he knew the tax value and the amount still due upon the mortgage, and there was no circumstance brought to the attention of the court or court officials that he did not understand what he was doing. At the hearing of this case he took the witness stand, and while he spoke broken English and for that reason it was difficult to understand him, he told of signing the bond, identified his signature, testified to the amount still due upon the mortgage and that he had attended to the payments upon the mortgage to the building and loan association; and all this testimony was accurate. He testified that if he had known that the signing of the bond would require him to pay money he would not have signed it. That, it seems to me, is the normal attitude of a person who signs a bond for the appearance of another.
While the physicians differed as to the exact extent of his mental capacity, my conclusion from all of the evidence is that at the time Jacob Epstein signed this bond he had contractual capacity, knew what he was doing when he signed the bond and the purpose for which he was signing it, and that such bond is a valid contractual obligation on his part in favor of the state of Ohio.
This proceeding is under Section 13435-18, General Code, in which, among other things, it is provided that if at the hearing “good cause is not shown the court shall then enter judgment against the sureties on such recognizance for such sum as it may see fit, not exceeding the full *328 amount thereof.” The procedure provided for in that section is similar to the scire facias of the common law.
In the case of State v. Hoeffner, 124 Mo. 488, it was held, as stated in the syllabus:
“A proceeding by scire facias upon a forfeited recognizance is the mere continuation of the original proceeding to enforce a debt confessed.”
At page 491 the court said:
“This is not a civil action within the meaning of the code for the recovery of money. Instead of a summons being issued requiring the defendant to appear and answer a petition, as in a civil action, a scire facias issues to the defendant requiring him to show cause why a judgment already confessed, interlocutory in its effect, should not be made final, and execution issued therein, the causes generally shown being nul tiel record, release or accord and satisfaction, no one of which, nor all of them, convert the proceeding into an action, which is said to be ‘a legal prosecution in an appropriate court by a party complainant against a party defendant to obtain the judgment of that court in relation to some rights claimed to be secured or some remedy claimed to be given by law to the party complaining’. 1 Am. and Eng. Encyclopedia of Law, 178; 1 Wait’s Actions and Defenses, 10. It is only in such cases that the parties are entitled to trial by jury in civil actions, unless the right is given by statute as in case of inquiry of damages upon the dissolution of an injunction bond, and cases of like character.”
At page 492 the court concludes its opinion as follows:
“From what has been.said, it necessarily follows that Section 28, Article 2, state constitution, which provides that ‘the right of trial by jury as heretofore enjoyed shall remain inviolate,’ has no application to this case.”
No request for a trial by jury was made in this case.
According to the mandate of the statute it is the duty of the court to enter judgment against the surety for such sum as it may see fit, not exceeding the full amount of the penalty in the bond. In. compliance therewith the court fixes the amount for which judgment should be entered against Jacob Epstein at Five Hundred ($500.00) Dollars, and an entry may be presented to carry this finding into effect.