In re Estate of Christ K. Haga.

Roy and Conrad Haga, Appellees, v. Korrell Ingebrightson, Appellant.

No. 43532.

February 9, 1937.

Rehearing Denied June 18, 1937.

Klay & Klay, for appellant.

Fisher & Riter and Henry Mundt, for appellees.

Sager, J.—On May 2, 1933, Christ K. Haga made the will involved herein. On the morning of the same day a court had directed a verdict in his behalf in a proceeding brought by his two sons (contestants-appellees herein) to have him declared incompetent and to have a guardian appointed over him.

The life history of the testator is out of the ordinary. He was found to be insane on April 20, 1915, and was confined in

an asylum in Yankton, South Dakota, until November of the same year. He was restored to full competency by order of court on May 29, 1916. From that date he apparently managed his affairs until the summer of 1923, when he was again committed to the same asylum and from which he was discharged in July 1925, and restored to full competency in October 1928. This second commitment appears to have been brought about largely because of sexual perversion, much evidence of which appears in the record but which need not be set out here. From the date of this second restoration to competency until the date of his death Haga managed his business without further control. Some, though not all, of his activities will be set out herein.

Some time in the early part of 1933, the sons of testator, appellees herein, learning that one Ingebrightson, father of proponent, had brought foreclosure proceedings in his own name on a mortgage owned by Haga, started a proceeding to have a guardian appointed for Haga for the reason, as their petition alleges:

"That the said Christ K. Haga is now mentally incompetent and has been for a period of several years, and is incapable from such incompetence of handling and managing his own business and property, and that he is easily influenced, and is at present rapidly dissipating his estate."

This application Haga resisted and the court directed a verdict in his behalf.

Why the mortgage above referred to was assigned to Ingebrightson does not appear, but under a contract made with Haga in January 1933, Ingebrightson agreed to account for the proceeds thereof.

Following the direction of a verdict in Haga's behalf he, in a few hours and on the afternoon of the same day, took back the mortgage by proper assignment, and had his attorney prepare a will which was duly executed and which now furnishes the subject of this controversy.

■■■ This brings us to an analysis of the testimony upon which the case turns. No attempt will be made to set out the testimony with reference to Haga's life up to the time of his second release from guardianship and his restoration to competency in October 1928. It is sufficient to say that the appointment of a guardian appears to have been warranted on both

occasions, the second appointment being based very largely upon sex perversion. In considering the weight to be given to the judgment of the court in restoring Haga to competency and to the management of his own business we have in mind our holding in In re Will of Fenton, 97 Iowa 192, 66 N. W. 99, which on the subject here involved has never been extended, modified, or overruled. In that case we said:

"The holdings are numerous to the effect that persons under guardianship are, *prima facie,* disqualified to make a will. In re Johnson's Estate, 57 Cal. 529; Hamilton v. Hamilton, 10 R. I. 538; Brady v. McBride, 39 N. J. Eq. 495; Breed v. Prat, 18 Pick. [Mass.] 115; In re Gangwere's Estate, 14 Pa. 417 [53 Am. Dec. 554]; McGinnis v. Com., 74 Pa. 245; Lucas v. Parsons, 23 Ga. 267; Woerner Adm'n., section 27; Schouler, Wills, sections 81, 82. In Leonard v. Leonard, 14 Pick. [Mass.] 280, in speaking of a person '*non compos mentis* under guardianship,' where it is held that, as to a payment to the ward, by one knowing of the guardianship, it was conclusive evidence of an unsound mind of the ward, the court says: 'We are of opinion that, as to most subjects, the decree of the probate court, so long as guardianship continues, is conclusive evidence of the disability of the ward, but that it is not conclusive as to all. For example, the ward, if, in fact, of sufficient capacity, may make a will; for this is an act which the guardian cannot do for him.' In Rice v. Rice, 50 Mich. 448 [15 N. W. 545], the proceeding was for the probate of a will, and the objection was on the ground of the insanity of the testator, who was, shortly after the making of the will, and on the same day, adjudged 'mentally incompetent to have the charge and management of his property,' and placed under guardianship. The contestants contended that the order appointing a guardian was *prima facie* evidence of a want of capacity to make the will, and the court (Mr. Justice Cooley delivering the opinion) denied even the *prima facie* effect of such an order, but said that, if the proceeding for the guardianship had involved the question of testamentary capacity, such a rule would have obtained."

We there reserved (and now leave open) the question as to whether the record of the discharge in guardianship was even *prima facie* evidence of soundness of mind. Under the facts in the case before us, we do give some weight to the fact that the

trial court found Haga of sound mind a few hours before the will was made.

As above stated, we do not set out the evidence of Haga's condition between the periods of his two commitments. During the time he was restored to the management of his own business he managed his own affairs until sexual perversion induced his second return to the asylum; but from his release in October 1928, while he was somewhat strange in his manner, it does not appear that he was not competent to manage his affairs, nor that his conduct was such as to suggest that a guardian should again be placed over him. One of his sons, who now contests his will, entered into a contract with him for the renting of a farm, and, while their relations seem not to have been entirely satisfactory, they disclose no hint of unsoundness. During this period, in addition to dealing with his son in the relation of landlord and tenant with the business incident thereto, he purchased real and personal property, and until the foreclosure proceedings in the name of Ingebrightson it did not occur to anyone that the oddities of Haga amounted to, or suggested, incapacity to manage his affairs. There are in the record many incidents of strange conduct produced by contestants, but the dates of their occurrence are in many cases uncertain and most of them seem to relate to the period before the second commitment to the asylum.

The relation between the testator and his sons was not very cordial and their manner of dealing with each other was more like that of strangers than that of close kindred, but this may be accounted for, perhaps, by the fact that the mother had divorced Haga about eight years before, getting the custody of contestants, who were then quite young. At the time of the divorce the mother of the contestants was the owner of one hundred twenty acres of land, and, for the support and maintenance of the two small boys, secured a property settlement of $8,500 from Haga, who at the time was the owner of one hundred sixty acres.

Following the contest over the appointment of the guardian, which resulted in the directed verdict as stated, on the day the will was made, Haga consulted his attorney and, without direction or interference, willed his property to proponent, except one dollar each to contestants and their mother, and named proponent as his executor without bond.

Before this, and in 1929, Haga had negotiated the purchase

of a farm with witness Lewis, who, after narrating some of the activities of the testator, stated:

"From what I saw of him, I think he was sane; as far as I could judge, he was all right."

About the same time Madelen (trucker) hauled lumber, hogs, oats, corn, and cattle for Haga, visited with him often, appears not to have seen anything unusual; on the contrary, he said:

"From the opportunity I had to observe him, I would say I never saw anything wrong with him; he certainly was sane."

To the same effect the witness Helgeson, a blacksmith by trade, who had done some work for Haga, and saw him:

"* * * off and on all the time he lived on the farm; * * * would say he was sane."

Anderson, a tenant of Haga in 1932, was a single man, and he and Haga lived together on the latter's farm, sharing the cost of their groceries out of the proceeds of eggs. He said that they had many conversations on general subjects and that from what he observed he regarded Haga as sane. He admits that Haga was a little odd. He explains this observation as being based on the fact that:

"* * * he would do things differently than I did, * * *."

Stensland, with whom Haga stored some of his machinery in the fall of 1929, says they went to the same church. Witness would often pick him up and take him there. The witness lived a quarter of a mile from Haga, who visited in the home of the witness once in a while. This neighbor regarded him as being "all right and that he was sane." On cross-examination this witness stated he had talked with Haga at sales two or three times and that he talked the same as any other person, and that he talked upon various topics, farming, prices, and so on.

Witness Skattebol, a carpenter, worked for Haga from June to the first part of November 1930, fixing the buildings on the farm the latter had purchased. During this period they visited a great deal and the witness stayed on the farm many nights. The witness saw him at other times in the neighborhood and in Canton, and expressed the opinion that Haga was sane.

Harold Bogue, of Canton, South Dakota, was the attorney to whom Haga brought the notice of the proceedings in which contestants sought to have him declared incompetent and to have a guardian appointed for him. Haga stated that he could not understand why the boys would do such a thing and believed that they were anxious to get his property. Before the trial of these proceedings the attorney talked over the evidence that was to be produced and Haga took an active part. The trial lasted a day and a half, during which time Haga sat beside the attorney and talked about it throughout. He was active in the defense, but was not called as a witness. After dinner (the trial ending about noon) he asked the attorney if it wasn't a good time to make a will. What was done immediately prior to the execution of the will is thus stated by the attorney who drew it:

"He asked me at that time to make his will and I asked him what property he had, and he told me what he had and about the mortgage which he had together with the back taxes and interest; he said he had some personal property on the farm, some horses, a few cows and machinery; he told me he had two sons, Conrad and Roy (contestants); and told me he was divorced from his wife, and that at the time he had given her $8,500 and that she had the support and care of the two minor sons, Conrad and Roy. He said he wanted to give his money and estate to Korrell Ingebrightson, he stated that the boys had started this guardianship action against him and that he had seen very little of the boys since the time his wife divorced him, and that he did not know Roy very well. He said he had stayed at Korrell Ingebrightson's; when he did not have a home he could always go to Korrell's, and that Korrell had always been kind to him, and stated that he had acquired the property and did not see why he couldn't give it to whom he wanted to. From my observations of him and in my opinion, he was sane."

We close this narration with the testimony of Dr. Hummer, who was called to examine Haga preliminary to the last hearing on the question of guardianship. At this time he spent an hour and a half with testator, and discussed his previous commitments to the asylum, property, people, and relatives, talked with him about his divorce and the way his sons had treated him. The doctor said:

"I tried his memory, his ideation, his reasoning faculty.

Tried to ascertain whether there were any delusions or hallucinations; tried to get a general idea of his attitude towards himself and his environments; very nearly exhausted the subject. There was a marked change in his mental condition from 1923 to 1933. In my examination in 1933 there is no question in my mind that Christ Haga was then sane. These facts were gathered from the examination and he had undoubtedly recovered. from his mental ailment in 1923.''

As stated, we have not undertaken to set out all the facts. The foregoing are sufficient to afford a fairly accurate picture of Haga and his mentality.

We have read the record in this case with care and we cannot escape the conclusion that contestants failed to sustain the burden of proving that Haga lacked testamentary capacity to make the will in question. It follows that the court erred in not sustaining proponent's motion to direct on this ground and in failing to sustain the motion for a new trial on the same ground.

■■■ Appellant contends that there was no evidence upon which to submit the issue of undue influence, and we think he is right. While it does appear that Ingebrightson furnished a home for Haga and at times counseled with him, it does not appear that proponent or his parents ever sought to influence him in the disposal of his property. That a mortgage owned by testator was in the name of Ingebrightson and foreclosure was started in his name, loses any sinister significance in the light of the contract held by testator under which an accounting was to be made to him of the avails of this mortgage. Nowhere in the record does it appear that proponent or his father and mother made any suggestions as to how Haga was to leave his property.

Appellant complains some of the instructions given by the court, but we do not, in the light of this opinion, find it necessary to consider them. Neither do we feel called on to set out the authorities cited by counsel. They announce familiar rules of law applicable to cases of this kind.

From what has been said it follows that this case should be, and it is reversed.—Reversed.

RICHARDS, C. J., and ANDERSON, KINTZINGER, PARSONS, and STIGER, JJ., concur.