MARY GREGORY, Appellant, v. CARRIE PROFFIT et al., Appellees.

No. 47210.

(Reported in 31 N. W. 2d 899)

464

Johnston & Shinn, of Knoxville, and Fleck & Jones, of Oskaloosa, for appellant.

Bray, Carson & McCoy, of Oskaloosa, for appellees.

MULRONEY, C. J.—An instrument purporting to be the will of J. W. McKissick, deceased, was accepted for probate and, pursuant to the nomination in the will, Ralph Ver Meer was appointed executor of his estate. The second paragraph of the will provided:

"I give, devise and give to my niece Carrie Proffit and to Minnie Kathryn Janse all my property of every kind and character, and wherever located, share and share alike absolutely and in fee simple. I made this provision for Minnie Kathryn Janse as compensation for services she has rendered me and for which she has not been paid."

On March 15, 1947, plaintiff, Mrs. Mary Gregory, filed her petition at law, against the executor and the two beneficiaries named in the will, alleging testator was her putative father; that testator did not at the time of signing said instrument possess sufficient mental capacity to execute a will; and that the purported will was the result of the undue influence exercised over the testator by the two named beneficiaries.

The trial resulted in a directed verdict for the defendants, at the close of plaintiff's evidence, on the ground of insufficiency of the evidence to establish the allegations of lack of testamentary capacity, and undue influence. Plaintiff appeals.

I.   The issue as to the sufficiency of the evidence requires a recital of the testimony of plaintiff's witnesses. The sufficiency of the evidence upon the issue of whether testator was the father of plaintiff was not challenged in the motion for directed verdict and it is conceded here the evidence was sufficient upon that issue.

J. W. McKissick was a farmer in Mahaska county. He married Anna Beal who, with her child, died in childbirth in 1914. He did not remarry. Prior to his marriage, when he was living with his parents, plaintiff's mother, Cleo Dunwoody, worked in his parents' home. On January 7, 1908, Cleo Dunwoody gave birth to contestant, and there was ample evidence in the form of admissions and declarations of testator to establish his paternity of plaintiff. There was testimony that in 1921 when Cleo Dunwoody was pressing him for support money for plaintiff, then about seven years old, he agreed with plaintiff's mother that if she would forego suit, he would leave all of his property to his daughter, and other testimony where he stated he would not ever make a will.

In 1944 testator retired and moved to Pella. He had been in ill health since before he retired and when the widow who had been taking care of him died, he went to Oskaloosa to the home of his sister, Mrs. DeWitt, for about ten weeks. He then went back to Pella to a house he had bought, and lived there until he died on September 29, 1946, at the age of seventy-three years, leaving an improved eighty acres of land and personal property valued at $21,328.71. The record indicates the Pella property was deeded to Minnie Janse before he died.

On September 16, 1946, thirteen days before he died, the two beneficiaries under the will and testator arrived at the office of an attorney in Oskaloosa and the testator asked the attorney to draw his will. The attorney said there was talk among all three while they were in his office but his talk was with the testator, and·he stated: "In telling me what he wanted to do he would turn to them occasionally and say 'How does that sound to you? Does that sound alright?' " When there was talk in the attorney's office about money in the safe-deposit box the testator said to Minnie Janse: "You have the key to it" or "You know where the key is." The attorney told them he had

no girl in the office at that time and they would have to return in the morning. The next morning testator returned with Carrie Proffit, and the attorney, who had the will prepared from his notes taken on the previous day, had a private conversation with deceased. The attorney stated deceased told him of some trouble. he had had in the past with a woman and that the woman had a child and that he wanted a will that could not be broken. Carrie Proffit was then called into the attorney's private office and the will was either handed to Mrs. Proffit to read or the attorney read it to her and testator asked her. "Does that suit you? Is that the way you want it?" and she replied: "It is your affair, not mine. If it suits you it is alright." The will was then executed in the attorney's office, after testator's renter and his wife were summoned to witness it.

Mrs. Carrie Proffit, who lived in Missouri, was testator's niece. Minnie Janse was not a relative but there was testimony that she had been "going with" testator for about twenty-two years. Mrs. DeWitt, testator's sister, was a widow receiving old-age pension and testator had another widowed sister and nine other nieces and nephews living at the time of the execution of the will.

Two doctors who operate the Mercy Hospital in Oskaloosa testified that testator had been a patient at their hospital for several years. He was not a patient in the hospital but they treated him in their office in the hospital. They treated and observed him on September 13, 16, 18, 20, 23, and 25, 1946, and they stated that on these dates he was very sick and was suffering from senile dementia, asthma, heart trouble, and pernicious anemia in the relapse stage, and hardening of the arteries. They said he had difficulty in breathing and complained of pain in his chest and he was in extreme physical and mental distress, very nervous and restless, and in a weak condition. They said he repeatedly asked the same questions, lacked mental composure, could not remember recent events, could not understand their questions and was always accompanied on trips to their office. They said he did not appear normal, that he was irritable, very pale in color, very apprehensive, and had to support himself when standing with a cane, or lean against

something solid, and his mind did not seem to grasp or assimilate. They testified he had been suffering from pernicious anemia for several years and that his mental sickness was progressive and a permanent disease and that in their opinion he was of unsound mind on all dates between September 13 and September 25, 1946.

Mrs. DeWitt testified to many peculiar actions of the testator when he lived in her home for ten weeks in 1946. She also saw him the day the will was planned in the attorney's office, and the date it was executed. She stated:

"James McKissick came to my home in Oskaloosa on September 16, 1946. Mrs. Proffit and Mr. Proffit were with him. He sat there with his hat pulled over his face. He cried. Tears rolled down his cheeks. He was at my home on September 17, 1946 * * * There was something unusual about his talk that day."

She said they did not tell her he was in Oskaloosa to make a will and she stated she was of the opinion that he was of unsound mind on September 17, 1946.

Three days before testator died, Mrs. DeWitt went to Pella to take care of him. While she was there Minnie Janse came to the house each day after four o'clock. She said Minnie Janse gave her orders to keep the doors locked and not let anyone in and every day when she came, she asked "Who's been here today?" and that she was angry when she learned someone had been there during the day. She said that testator "acted like a child. He was influenced. He would do anything you wanted him to do."

There was testimony of another witness who had known testator for fifty years who said he had a reputation for being a little queer and this witness saw the testator on September 16th sitting on the steps in the courthouse and talked to him, and testator said: "I was down to the toilet and I am sitting down here because I don't feel very well. I thought I wasn't going to get back." The witness said he left when Mrs. Proffit and her husband and another man came up.

Another witness testified he had known testator for more than forty years and was a good friend of his. He said he met

him on the street in Pella about two weeks before he died and testator would not talk to him and acted like he did not know him.

II. The controlling principles of law applicable to the two issues are well recognized and have many times been stated by this court. In each case the facts determine and when passing on the sufficiency of the evidence the court must consider the evidence in a light most favorable to the contestant. Further review of the authorities would serve no useful purpose and we will merely cite our opinions in In re Estate of Maier, 236 Iowa 960, 20 N. W. 2d 425, and In re Estate of Telsrow, 237 Iowa 672, 22 N. W. 2d 792, for the applicable legal principles.

It is our conclusion that under the record the issues of lack of testamentary capacity and undue influence were for the jury. The case is much like the Maier case on the issue of lack of testamentary capacity in that in both cases the testimony of testator's unsound mind came from medical witnesses whose opinions were based upon personal observation and examination of decedent, at or about the time the will was executed. In each case nonexpert witnesses testified to facts sufficient to warrant the expressions of their opinions that the testators were of unsound mind when the will was executed.

There is no merit in appellees' argument that the cross-examination of the doctors so weakened or destroyed their direct testimony as to leave the record without sufficient evidence of testator's unsoundness of mind. The cross-examination of each doctor was merely further inquiry, designed to test the knowledge of each doctor and the accuracy of their statements given in direct examination, all to the effect that the testator was under physical and mental incapacity at the time the will was executed. The cross-examination would have a bearing on the credibility of the witnesses and on the weight which should be given to all of their testimony. But we are not to determine the truth of their testimony. In our review on the issue of the sufficiency of the evidence we give the evidence the most favorable aspect it will bear in support of contestant's claim of mental incompetency. In re Estate of Coe, 234 Iowa 1113, 15 N. W. 2d 278.

The case is much like the Telsrow case on the issue of undue influence. There, as here, there was persuasive medical testimony

of testator's unsoundness of mind, based on the doctor's examination, and testimony tending to show undue influence by the principal beneficiaries. Judge Garfield, speaking for the court, in the Telsrow case said at page 677 of 237 Iowa, page 796 of 22 N. W. 2d:

"The issue of undue influence in a will contest cannot be separated from that of testamentary capacity. Conduct which might be insufficient to influence unduly a person of normal mental strength might be sufficient to operate upon a 'failing mind."

In the instant case, as in the Telsrow case, the testimony indicated the two beneficiaries took an active part in the execution of the will. Here, they took an active part in the planning of the will. The testator's questions, addressed to the beneficiaries in the attorney's office, suggest that his will was to be subject to their wishes. The jury could well conclude the will was unnatural in view of the fact that it disinherited his only child who, under the record, he had never supported but to whom he had promised his property at his death. It is worthy of consideration also that it excluded his aged, indigent, widowed sister. The jury did not need to believe the statement of Minnie Janse, made two weeks after testator's death, that testator left money to her to give to Mrs. DeWitt, and that this was done so Mrs. DeWitt could receive the money and not lose her pension.

III. There was other testimony which plaintiff asserts was admissible on the issue of undue influence which the court did not admit. The evidence offered by the testimony of Mrs. DeWitt was that Carrie Proffit told her that shortly after testator's death, and before burial, she and Minnie Janse went to the bank; that Minnie, who had the key to testator's lockbox, opened the box and removed papers and money from the box. Defendants' argument in support of the ruling that this evidence was inadmissible is:

"It is not necessary for us to make any comment on this offer other than to call attention to the fact that no bank would permit anyone to open a deceased's safe-deposit box holder's lockbox before an estate had been opened."

470

We hold such evidence was admissible.

The same is true with respect to testimony, which was ruled inadmissible, relating to acts of Carrie Proffit after the testator's death and before burial, in destroying and removing personal papers of the deceased which were in a box in his home. We think this evidence should have been admitted.

The bank incident was consistent with the statement made by the testator in the attorney's office concerning Minnie Janse's possession of the lockbox key and it tended to prove a possible confidential relationship existing between the deceased and Minnie Janse. Both incidents might well come under the head of suspicious circumstances and as such they would be admissible upon the issue of undue influence, which so often must be established by circumstantial evidence.

Other complaints of rulings on the introduction of evidence need not be ruled upon as the precise questions may not occur again.

The cause is reversed.—Reversed.

OLIVER, BLISS, HALE, GARFIELD, MANTZ, SMITH, and HAYS, JJ., concur.

WENNERSTRUM, J., dissents.

WENNERSTRUM, J. (dissenting)—The conclusions which the majority opinion draws from the evidence and the final holding announced are of such a nature that I find myself unable to join therein and therefore respectfully dissent. The majority opinion fails to give consideration to certain fundamental rules which this court has in the past held to be basic in will-contest cases.

The burden is upon the contestants in a will-contest case to show that at the time of the execution of the will in question the testator did not have testamentary capacity. In re Estate of Heller, 233 Iowa 1356, 1365, 1366, 1367, 11 N. W. 2d 586, 592, and cases there cited. A review of the evidence as set out in the majority opinion, and as disclosed by the record presented to this court, fails to show any mental incapacity

at the time of the execution of the will. Inasmuch as this burden is upon the contestants it is my judgment that the trial court properly directed a verdict on that issue.

There is an entire absence of testimony to prove that undue influence was exerted at the time the will was executed. The burden to prove this condition is upon the contestant. Brackey v. Brackey, 151 Iowa 99, 101, 130 N. W. 370. It was stated in In re Estate of Heller, supra, as follows:

"Facts must be proven tending to show undue influence, or from which reasonable inferences of its exercise may be drawn."

Numerous authorities are cited in the opinion in support of the quoted statement. The evidence in the instant case, in my judgment, fails to show undue influence and no reasonable inference can be drawn that any influence was exercised at the time the will was executed. Consequently, the trial court further properly directed a verdict on that issue.

Unless this court desires to hold that former opinions are not to be guides to the bench and bar of this state in cases of this character we should adhere to our former rulings. Besides, the making of a will is a solemn and important act in an individual's life. The provisions of a will should be carried out and its probation should not be denied if the evidence presented does not meet the requirements of the rules previously announced by this court. By reason of my conclusions that the contestant has failed in the requirement of proof I would affirm.