IN RE WILL OF FREDERICK GRAHLMAN, deceased.

ARTHUR GRAHLMAN et al., appellants, v. WILLIAM GRAHLMAN, and C. E. LEACH, as executor, appellees.

No. 49055.

(Reported in 81 N.W.2d 673)

March 5, 1957.

538

Sweet, Sager & Engelbrecht, of Waverly, and R. J. Sullivan, of New Hampton, for appellants.

Donohue & Wilkins, of New Hampton, for appellees.

PETERSON, J.—Frederick Grahlman was born in Germany December 23, 1862. He came, as a young man, to the United States, was married, and for his life's occupation became a farmer. He purchased his first tract of land consisting of 80 acres in 1888. In 1902 he purchased an adjoining 160 acres, and in 1914 another 40 acres, thereby accumulating a total of 280 acres, of which he was the owner at his death. He and his wife reared six sons and four daughters. During the years from 1888 to 1922 he personally operated his farm. In July 1922 he purchased a small home in Fredericksburg, about six miles from the farm, and moved to town. He lived in this home thirty-two years. On December 2, 1954, he had a stroke and was removed to a hospital at West Union. He was confined in the hospital until he died on May 2, 1955. His wife died in 1937. After that his son Edward lived with him for about five years; another old gentleman lived in the house for two years; otherwise he lived alone. Various children came from time to time to clean up the house and help him in connection with the maintenance of the home. He drove a car until a year and a half before his death. September 12, 1946, he went to the office of an attorney at New Hampton and executed a will.

In his will he provided first for the payment of his just debts. He devised to his son William 120 acres of his farm. He said in the will this devise was in appreciation of the kindness of William and his wife to him during his lifetime. In connection with this specific devise he provided that if there was a mortgage against the farm at his death it should be paid by the executor

from other property in the estate. There was a mortgage of $2500. He then devised and bequeathed all the rest, residue and remainder of his property, share and share alike, to his ten children, naming them, including William. He appointed C. E. Leach, his banker, as executor of the estate with power to sell real or personal property to pay debts, mortgage, and any other obligations and divide the proceeds among the devisees under the residuary clause. The value of the estate, according to inventory and stipulation, was $23,895.70. Of this amount the value of the farm bequeathed to William was estimated at $12,000. The will was witnessed by Evelyn B. Wilkins and E. P. Donohue.

At the same time the will was prepared he entered into a lease with William for rental of his farm, for the year starting March 1, 1947. The evidence is not too definite, but there seems to be general acceptance of the fact that William was with his father at the lawyer's office on the day the lease and will were executed.

The eight living children, outside of William, contested the will on the grounds of mental incapacity, fraud and undue influence. After testator executed the will, his daughter, Mary Harnisch, departed this life leaving two children. Proponents established the due execution of the will by testimony of subscribing witness, Evelyn B. Wilkins. The will was received in evidence. Contestants offered the evidence of two sons-in-law, one nephew, two tenants and their wives, four friends of decedent, and three doctors. After contestants rested, proponents filed motion for directed verdict which was sustained by the trial court. Contestants appealed.

I. In many cases, and especially in recent decisions, we have established a definite test concerning testamentary capacity. The testator must: (1) Understand the nature of the instrument he is executing; (2) know and understand the nature and extent of his property; (3) remember the natural objects of his bounty; (4) know the disposition he desires to make. We have approved this general test for many years, but recently it was clearly stated in: In re Estate of Rogers, 242 Iowa 627, 630, 47 N.W.2d 818. We have reaffirmed the test in: In re Estate of Groen, 245

Iowa 634, 638, 62 N.W.2d 143; In re Estate of Moeller, 247 Iowa 174, 182, 73 N.W.2d 15, 19; Gillette v. Cable, 248 Iowa 7, 13, 79 N.W.2d 195, 199.

II. A résumé of the evidence, pertaining to mental condition of testator and any evidence of fraud or undue influence, will be of assistance in deciding the questions involved. We will note the rulings of the court, but will consider their legal effect later.

Elmer O'Connell testified he was a son-in-law of decedent and had known him since 1926. Mrs. Grahlman died in 1937 and from the time of her death until 1942 his son Edward lived in the home with the father. From 1950 to 1952 a man by the name of Will Moeller occupied the home with decedent. Otherwise, decedent lived alone, except for visits of various children. He stated decedent talked in "a foolish way." On motion this statement was stricken by the trial court as a conclusion. He heard decedent say "that he wanted his children to all have the same." This was stricken by the trial court for failure to fix the time when the statement was made. Decedent continued to drive his car until approximately a year and a half before his death. During the summer months up until the year 1949 he would drive his car to the farm. After that he only drove it around town. In 1951 decedent asked O'Connell to assist him in looking after his business, and executed power of attorney for such purpose. In 1953 decedent executed a note and gave a mortgage on 120 acres of his farm in the amount of $2500 and O'Connell assisted him in this business transaction. The money from rentals and proceeds of the loan were paid to decedent and deposited in his bank account. He related the fact that in December 1946 the children, including William, filed a petition against decedent for appointment of a guardian on the basis of his age and general inability to take care of his affairs. Shortly after filing the case William withdrew as a party plaintiff. Decedent retained counsel to contest the guardianship proceeding and answer was filed. The case was never tried. On March 19, 1948, it was dismissed without prejudice. This witness was asked as to whether he had an opinion as to the soundness of mind of dece-

dent in September 1946. He said he had. When he was asked as to what the opinion was, objection was made. The court sustained the objection. The son William was a tenant on decedent's farm on two occasions. Starting in 1936 for seven years; starting again in 1947 for five years.

Emil Schmudlach lived at Nashua. He was 55 years old and a nephew of decedent. His testimony was very brief. He stopped to see his uncle occasionally and in 1947 decedent said his legs bothered him, but "after he got going it wasn't so bad." Grahlman was a jolly, sociable old gentleman and enjoyed visiting with people. He would see him on an average of once or twice a year for about an hour or an hour and a half. They talked about old times and old friends and he carried on the conversation the same as usual. When he saw him they had nice visits. No opinion was requested from this witness as to soundness of mind.

Albert Thein was a tenant on the Grahlman farm from March 1, 1946 to March 1, 1947, when William moved on the farm. During the summer of 1946 decedent came on the farm a lot of times. He walked kind of crippled. This witness started to testify about some repairs Grahlman had promised, but failed to make. The question was objected to on the basis of section 622.4 and the court sustained the objection. The evidence was then proffered in chambers. The witness in later testimony covered the subject of repairs in detail. He related the actions of decedent when they were dividing the property at the close of his tenancy: "He just jabbered to someone, talked to somebody else, wasn't paying any attention to what was divided." This was stricken by the court as a conclusion of the witness and not a part of any conversation. He said decedent "acted like he was kind of silly * * * and acted childish * * * monkeying around, jabbering to himself", all of which was stricken as a conclusion and opinion. Grahlman brought 500 little chicks to the farm, all of which were roosters, without telling them about it in advance. This witness was asked as to whether or not he had an opinion as to testator's mental condition on September 12, 1946. Before objection could be made he answered: "he

was unsound." On motion this was stricken by the court as not responsive and a conclusion.

Maynard Thein was also a tenant during the same year and he testified about the lease which was on a 50-50 basis. He stated: "He never dressed very good; always old clothes he had on." He was the only witness who testified decedent was "drunk most of the time pretty well. * * * He usually repeated over and over all the time and talked childish * * * well he was childish and acted childish * * * his talk was always something silly." On motion this was stricken as a conclusion. He had an opinion as to testator's mental condition. The court sustained objection to the question: "What is that opinion?" Contestants proffered testimony that his answer would have been: "That in his opinion on September 12, 1946, Fred Grahlman was of unsound mind."

Eva Thein was the wife of Maynard, the tenant. Her testimony was very brief. She said she did not pay much attention to Fred Grahlman when he came on the place, but did state that: "He acted more like a kid than he did a man." On motion this was stricken. She repeated the chick incident, but was not asked as to her opinion.

Alma Thein, wife of the tenant Albert, testified briefly. She said the women were in the house and the men talked business outside. However, she stated: "Well he acted childish, foolish * * * yes, he acted foolish and roamed around the farm * * * just something like a little kid, a foolish laugh." On motion this was all stricken as a conclusion. She said he did not dress very good, was kind of dirty and slouchy. This witness was not asked as to her opinion concerning his mental condition.

Peter Kettles testified he was 65 years of age and that before 1940 decedent was a man weighing about 170 pounds, but in 1946 was much thinner and his clothes were a little ragged and dirty. He met him in the store in town and in 1946 thought he saw him about once a week. He talked with him about old times. He said he saw him in the spring of 1946, and stated: "He was talking over and over again so we didn't visit much after that." This witness was asked whether he had an opinion as to Fred Grahlman being of sound or unsound mind on September 12, 1946. His answer was "No."

W. W. Ball testified he was 70 years of age and knew decedent since 1936. Before 1940 he was a man weighing about 140 pounds, but in 1946: "Well he didn't look the same and he didn't really act the same." On motion this was stricken as a conclusion. Between 1935 and 1940 he talked with Grahlman and he said he did not have a will, and thought he would just let his children all share alike. When the son Will lived on the farm he would frequently see the father and son together. This witness was asked whether he had an opinion as to Fred Grahlman's mental condition on September 12, 1946. He said he had. When the question was asked as to the opinion the objection was sustained.

Emory Bravener testified he was 62 years old and lived in Fredericksburg and had known decedent since 1925. In 1940 decedent weighed about 170 pounds, but in 1946 he was not near as heavy and appeared like he did not take care of himself. His clothes, hands and face were dirty. This man worked for the elevator which handled feed and coal. He was asked about conversations with decedent concerning the ordering of coal when he already had coal, and concerning the fact that he owed an account when it had already been paid. Objection was made to this conversation under section 622.4 and the court sustained the objection. The testimony was proffered by contestants. Contestants also proffered evidence that this witness would testify decedent was of unsound mind. The court sustained objections to the testimony.

Harry McConkey testified he was 80 years of age. Lived for a number of years north of Fredericksburg. Knew Fred Grahlman when he occupied the farm, and saw him often after he moved to Fredericksburg. In 1946: "He was dirty, wasn't keeping his clothes up; wasn't clean in his face and the like of that." He volunteered, in answer to a question, that "In my opinion his mind was not good." This was stricken as not being an answer to a question and as a conclusion. He testified: "Somebody would say something, he would stop, maybe go right on and tell it over again." Grahlman said his legs and feet were bothering him. Doctor Zoller told him he had hardening of the arteries. He volunteered in answer to another question "Well

544

as to my judgment his mind wasn't good." This was stricken as not answering the question asked and as a conclusion. This witness was asked as to his opinion concerning decedent and in response, before objection could be made, stated: "I would say his mind wasn't normal." This was stricken as not responsive and as a conclusion. He was specifically asked if he had an opinion as to his mental condition and stated he had, but when asked what the opinion was, objection to the question was sustained.

Thomas Reay was a son-in-law. He was 69 years of age. Decedent stated in his presence in 1946: "My legs and feet hurt me, I am no good any more." He testified: "He was getting to be an old man and of course he was slipping." On motion this was stricken by the court as a conclusion. At times decedent seemed quite rational and at other times he seemed more childish. Sometimes his clothing looked pretty dirty and sometimes it looked cleaner. He would start a conversation, then quit and seemed to forget what he was talking about the first time. Sometimes he talked quite sensible and sometimes he did not. This witness was asked if he had an opinion as to his mental condition and he said he did. When he was asked as to the opinion, objection was sustained by the court. In his testimony under cross-examination appear the following questions and answers:

"Q. And up to that time (1946) he had been a man of excellent health, hadn't he? A. Well, pretty fair health for a man of his age. Q. That's right and in 1946 he was a man of pretty fair health for a man of his age, a man of eighty-four, isn't that right? A. Yes, I guess it is. Q. When did he stop driving his car? A. He stopped driving the car quite a little while before he had a stroke. Q. All right, about when, in your judgment? A. It would be about a year anyway. Other people used to drive the car a part of the time. Q. In the years 1947, 1948, 1949, 1950, he kept a garden, didn't he? A. Well, I wouldn't say so much about when. You mean up to 1950? Q. Did he in 1949? A. I guess he did. Q. And he took quite a pride in his garden, didn't he? A. Yes, I guess."

Contestants offered the testimony of three doctors as expert witnesses. The only doctor who had ever seen decedent was Dr.

L. L. Carr of West Union. He did not see him until after he had the stroke on December 2, 1954, when he was brought to the Good Samaritan Home at West Union. Doctor Carr treated him until his death on May 2, 1955. The other two doctors were Dr. F. R. Sparks of Waverly and Dr. J. L. Caulfield of New Hampton. All three doctors were asked lengthy hypothetical questions. Objections were made to the questions on the grounds they were too involved and complicated and included many statements concerning decedent which did not appear in any testimony in the case. The objections were sustained.

III. In the appeal contestants assigned 77 errors. They can be grouped in eight groups:

1. Errors 1, 7 and 32 pertain to the ruling of the trial court concerning evidence excluded by the court under section 622.4, Iowa Code 1954, commonly known as dead man statute. Error 1 is a general statement that the court erroneously interpreted the section, without reference to any specific ruling. The sons-in-law O'Connell and Reay testified concerning some statements and actions to which no objection was made. They were not incompetent to testify as to appearance and actions of testator ascertained by observation. Ipsen v. Reuss, 239 Iowa 1376, 35 N.W.2d 82. Error 7 pertains to exclusion of evidence of the witness Albert Thein, tenant. The court was in error in excluding the evidence of this witness, but the error is not prejudicial to contestants because it pertains only to the failure of the landlord to make some repairs, which is immaterial as far as his mental condition was concerned. Later in the testimony of Thein any error was cured because he testified at some length concerning the matter of repairs. Error 32 pertained to the exclusion of the testimony of the witness Emory Bravener. Bravener had charge of the elevator. The evidence should have been admitted, but the error is not prejudicial. The evidence concerning double order of coal and double request as to what he owed is trivial, and not material as to his mental condition.

2. Twenty-seven alleged errors pertain to rulings by the court on admission of evidence. Appellants argued these 27 alleged errors as a group. They all pertain to questions where

the witnesses used the following expressions: "he talked in a foolish way"; "he talked silly"; "he just jabbered to someone"; "he acted childish"; "his mind was not good;" "his mind wasn't normal"; "he was slipping." Most of this evidence was stricken by the court as the conclusion of the witness rather than a statement of fact. Some of the rulings of the court sustaining objections and striking answers already made were proper. Other answers which were stricken should have been permitted to stand. However, if the evidence had been admitted it was of no value to contestants. The evidence still falls far short of the tests we have approved concerning matters necessary to establish unsoundness of mind.

■ 3. This assignment refers to errors 3 and 4, relating to testimony concerning statements of testator about making a will, and his statement "that he wanted his children to all have the same." Witness O'Connell testified: "I had heard that Fred had drawn a will; I didn't know; it had been some hearsay but I didn't know." This was not stricken and he was then asked the following question: "Q. Did Fred ever tell you he had drawn one?" Objection to this question was sustained on account of irrelevancy and immateriality. Since the witness had already stated whatever he seemed to know on the subject, sustaining this objection was not prejudicial. The same witness was asked if he heard a conversation in 1946 between decedent and his wife, daughter of decedent, to the effect "that he wanted his children to all have the same." Objection was made on the ground that the date in 1946 was not shown, irrelevancy and immateriality. The court's ruling was correct for reasons stated in the objection. Testator said the same to witness Ball, but that was between 1935 and 1940, and was immaterial.

■ 4. Ten errors assigned have reference to the exclusion of evidence by the court as to opinion of nonexpert witnesses concerning decedent's soundness of mind. In order to properly analyze the position of the court we must keep in mind the rule concerning evidence of this type. In Gillette v. Cable, supra, at page 14 of 248 Iowa, page 199 of 79 N.W.2d, we quoted the rule from previous decisions: " 'A nonexpert witness may testify to unsoundness of mind *only after stating sufficient facts to support the conclusion.*' " (Emphasis ours.) Neidermyer v. Neidermyer,

237 Iowa 685, 689, 690, 22 N.W.2d 346; Ipsen v. Ruess, 239 Iowa 1376, 1379, 35 N.W.2d 82; In re Estate of Ransom, 244 Iowa 343, 358, 359, 57 N.W.2d 89; In re Estate of Heller, 233 Iowa 1356, 1363, 11 N.W.2d 586; Olson v. Olson, 242 Iowa 192, 204, 46 N.W.2d 1, 40 A. L. R.2d 1. Contestants offer the testimony of eleven laymen. Three witnesses were not asked their opinion. It was evident their evidence was so meager there was no basis for the question. One witness testified he had no opinion. As to the other seven witnesses, they were asked as to whether they had an opinion, and upon stating in the affirmative they were asked as to the opinion. Objection was made and sustained. We will briefly review the evidence concerning statements or actions of the testator to see whether or not they constitute sufficient facts to support the conclusion. For the sake of this analysis we will not include the conclusions stricken by the court. The other statements were: He said he wanted his children all to have the same; he failed to make some repairs on the farm which he had promised to make; he did not dress very good, always old clothes he had on; he said the same things over and over again; in 1946 he did not look or act the same as in 1940; his clothes, hands and face were dirty; he ordered coal twice; he did not recognize me on the street; his legs and feet hurt him; he was an old man. Only one witness said he drank too much beer, and became drunk. There is no evidence whatsoever that this took place on the day the will was made.

These are the statements most favorable to contestants and in the matter of consideration of motion for directed verdict it is necessary that we view the evidence in the light most favorable to contestants. Sevening v. Smith, 153 Iowa 639, 133 N.W. 1081; In re Estate of Grange, 231 Iowa 964, 2 N.W.2d 635; Gregory v. Proffit, 239 Iowa 463, 31 N.W.2d 899.

In sustaining objections to the opinion of nonexperts the trial court should take all evidence of each witness into consideration. Testator lived in his home for over eight years between the time he executed his will and the time he had his first stroke in December 1954. He was an old man between 84 and 92 years of age and he had some physical defects, particularly in his legs and with reference to walking. Otherwise, outside of occasional help given him by his children when they

548

came to the house and cleaned it up, he lived a normal daily life. He drove his car until about a year before his stroke. He was downtown in the business district almost every day. He spent a great deal of time in the tavern. He had a garden for three years after the will was made, in which he took great pride. Taking all these matters into consideration, including the frailties and peculiarities of decedent, the trial court was correct in sustaining objections to the opinion of the witnesses. There was not as to any witness sufficient testimony to support the opinion.

5. Nineteen errors refer to court's ruling sustaining proponents' objection to evidence of the three doctors as expert witnesses. Two of the doctors had never seen the testator, and the other doctor did not see him until December 1954 which was more than eight years after the execution of the will. All questions propounded were hypothetical. Whether or not such a question is subject to exclusion depends upon its content. The question should only contain all matters properly admitted in the testimony concerning testator. If the questions contained such matters they should be of sufficient weight and significance to justify the opinion of an expert. 95 C. J. S., Wills, section 462(9); 57 Am. Jur., Wills, section 127; Manatt v. Scott, 106 Iowa 203, 76 N.W. 717, 68 Am. St. Rep. 293; Adams v. Junger, 158 Iowa 449, 139 N.W. 1096; Boston v. Keokuk Electric Co., 206 Iowa 753, 221 N.W. 508; Ipsen v. Ruess, supra; In re Estate of Maier, 236 Iowa 960, 20 N.W.2d 425; In re Estate of Meyer, 240 Iowa 1226, 37 N.W.2d 265.

95 C. J. S., supra, page 434, states: "Evidence in the form of an opinion by a medical expert as to the mental condition of a testator the expert has not seen has been held to be sufficient to raise an issue of fact for the jury on the question of the competency of the testator where the facts on which the opinion is based are such as will in reason and common knowledge support the expert opinion, but such an opinion *rises no higher than the level of the evidence and the logic on which it is predicated*, and if the facts on which the opinion is predicated are insufficient when measured by the requirements of law to raise a jury issue, the expert opinion is also insufficient." (Emphasis ours.)

In Ipsen v. Ruess, supra, (page 1389 of 239 Iowa, page 91

of 35 N.W.2d) we said: "Hypothetical questions to an expert upon direct examination should be based upon facts the testimony tends to establish." We also said (page 1388) : "As stated, in answer to a hypothetical question to which proponents objected Dr. Woods expressed the opinion testator was of unsound mind on and after May 14, 1942. The question assumed the truth of the statements in various hospital records and other matters of which contestants claimed there was evidence. Since we have held in Division III hereof certain portions of these records should have been excluded, the doctor was not entitled to express an opinion based in part upon such portions."

In In re Estate of Meyer, supra, (page 1238 of 240 Iowa, page 271 of 37 N.W.2d) we said: "The mere fact that the expert witness, * * * from the hypothesized facts, expressed his opinion that testator was of unsound mind and lacked testamentary capacity on [the date the will was made] did not warrant the submission of the case to the jury when the opinion was based on a recital of facts which the law does not recognize as showing testamentary incapacity."

▮▮▮ The questions propounded to Doctors Carr, Sparks and Caulfield were of undue length. A large percentage of the facts and statements contained in the questions asked the three doctors does not appear in the testimony. The life history, statements and actions of the testator contained in the questions were insufficient to justify answers to the questions, or to raise a jury question.

▮▮▮ 6. Errors 72 and 73 allege that contestants were prejudiced because the order admitting the will to probate was filed in the clerk's office before the order sustaining proponents' motion for directed verdict. The record discloses the evidence was concluded, and contestants rested, immediately before the noon hour recess on February 3, 1956. Proponents then filed their written motion for directed verdict. During the noon hour the trial court gave consideration to the motion and decided to sustain it. He dictated his ruling on the motion, and also dictated an order admitting the will to probate. The motion to direct a verdict and the two orders of court were all filed with the clerk. The clerk's stamp as to filing marked the order ad-

mitting the will to probate at 1:26 p. m.; the motion to direct a verdict at 1:27 p. m.; the order of court sustaining the motion, and the verdict of the jury at 3:13 p. m. On February 14 the court. filed a nunc pro tunc order' and judgment sustaining the motion as to all grounds of contest and entered judgment for costs against contestants. The sequence of events was somewhat out of order, but the three filings on the afternoon of the closing date of the trial were administrative matters in the clerk's office. There is no question about the ruling of the court. If there were any administrative matters omitted, the court had a right on February 14 to enter the nunc pro tunc order and judgment completing the record. There is no prejudice to contestants in this procedure which warrants a reversal.

7. In errors 75 and 76 contestants alleged they were prejudiced because in the written verdict submitted by the court to the jury, with instruction to find for proponents, the court said: "Was the testator, Frederick Grahlman, of sound mind at the time of the execution of the instrument which purports to be his last will and testament, and was the same witnessed as required by law?" The court instructed the foreman of the jury to answer the question "Yes" which he did. The error urged by contestants is that the court did not include in the verdict the questions of fraud or undue influence. In the objections to probate of the will these questions were raised.

In its ruling on the afternoon of February 3 the court stated: "To warrant the submission of the evidence to the jury in this case the record should show evidence to warrant a responsible person to say that at the time in question Frederick Grahlman was mentally incompetent. This has not been shown and neither has it been shown that he was unduly influenced. For the reasons stated the court sustains the motion to direct a verdict in favor of proponent as to both divisions thereof. The case is therefore withdrawn from consideration of the jury."

On February 14, which was eleven days after the conclusion of the trial, the court filed nunc pro tunc order in which he stated: "The court after reviewing the files in said cause finds that on the 3d day of February 1956—at the conclusion of the evidence introduced by the contestants in the above entitled

cause—the court sustained the motion filed by the proponents requesting the court to direct the jury to return a verdict against the contestants as to both of the grounds raised by the contestants on the admission of the last will and testament of said decedent to probate; namely, on the grounds of mental incompetency and undue influence and the court finds that it did direct the foreman of the jury to return a verdict in favor of the proponents as to both issues raised by the contestants." The court did not technically include the grounds of fraud and undue influence in the verdict signed by the foreman of the jury. The important matter is that the court sustained proponents' motion to direct a verdict on all grounds. This controls the situation rather than the technical matter of the signing of the verdict by the foreman of the jury.

8. Error 71 is a general statement to the effect that on all evidence as introduced the court was not justified in directing a verdict. Error 77 is a general statement that because of the irregularities, mistakes and erroneous rulings of the court and allowing many interruptions by objections and motions to strike, which were not warranted, the contestants did not receive a fair and impartial trial and were prejudiced thereby. These two alleged errors need no discussion. They are too general to be effective, and the elements involved are covered in our detailed discussion concerning other alleged errors.

Nine assignments of error were not argued by the appellant. We will not consider them. This is not of importance because the matters alleged in such assignments of error are all covered in the various groups to which we have heretofore referred.

IV. Failure to call witnesses who obviously were well acquainted with testator in or about 1946 militates against contestants. In re Estate of Ransom, supra; In re Estate of Ruedy, 245 Iowa 1307, 66 N.W.2d 387; Renze v. Renze, 247 Iowa 25, 72 N.W.2d 490; Bowles v. Bowles, 248 Iowa 930, 81 N.W.2d 15. Testator lived in the same home in Fredericksburg for thirty-two years. He was on the main street of the town almost every day. None of the people who came in close contact with him every day, and who was best qualified to enlighten the trial court, and this court, on his statements, actions and mental condition was called. Neither his neighbors, grocer, butcher, gas-station

operator, banker, nor even the tavern keeper, where he spent so much time, was called to testify. Not one of the eight children testified. As to some evidence they would be disqualified, but there would be many matters on which they could enlighten the court better than anyone else. We cannot decide a case on evidence not offered, but the absence of this testimony is significant, and explains, to some degree, the inability of contestants to satisfactorily sustain their contentions by the evidence which was presented. To offer a group of witnesses, many of whom knew nothing, and the remainder only isolated and fragmentary incidents, when the facts were apparently available, raises a serious question as to the actual facts concerning the allegations of contestants.

V. Contestants allege fraud and undue influence on the part of the son William Grahlman in connection with execution of the will. There are only three matters in the record pertaining to this charge: 1. Although there is no direct testimony concerning the matter, it seems to be assumed William was with his father at the lawyer's office when the will was executed. The only testimony is that a check of testator to the attorney in the amount of $6 was dated on the same day as the will and lease. 2. Under the will William received more than one half of the estate. 3. Although the will states additional property was left to William because of the kindness of himself and wife to testator during his lifetime, appellants allege this was not true.

The elements which must be present to  justify submission of a case to a jury on the basis of undue influence are: dominance over testator; condition of testator's mind as to whether or not he is subject to such dominance; general character of the disposition of his property; activity of dominant agent in connection with the making of the will. 95 C. J. S., Wills, section 463b(1) ; In re Estate of Ransom, supra; In re Estate of Sinift, 233 Iowa 800, 10 N.W.2d 550; Perkins v. Perkins, 116 Iowa 253, 90 N.W. 55.

There is no evidence concerning activity on William's part to have a will made. Evidence concerning his presence when the will was made is fragmentary. Evidence of influence in connection with terms of will is completely absent. There must be substantial evidence to establish fraud. His presence when the

will was made, without any other evidence of undue influence, is not sufficient to generate a jury question. 95 C. J. S., Wills, section 463a and b(g); In re Estate of Gormly, 188 Iowa 467, 176 N.W. 252. See 95 C. J. S., Wills, supra, page 434: "It is, however, for the court to determine whether the evidence has sufficient probative force to carry the issue of fraud to the jury, and where the evidence adduced is insufficient to sustain a charge of fraud or of duress the court may properly withdraw the issue from the jury, * * *. The issue of fraud should not be submitted to the jury in the absence of substantial evidence that the alleged fraud induced the making of the will, or that the fraudulent representations were relied on by the testator, or that the fraudulent representations caused the testator to make a disposition different from what otherwise would have been made."

In In re Estate of Gormly, supra, the beneficiary was present. The evidence is much stronger as to possible influence than the case at bar, but we said (page 470 of 188 Iowa, page 253 of 176 N.W.): "On the question of undue influence, there was evidence tending to show that the proponent was present when the will was made, and that the terms of the will were more or less discussed with him. This evidence was, of course, admissible, and has its significance as far as it goes. But there is no evidence of undue influence exercised by him, unless it be found in the mere fact that he was the larger beneficiary of the will. This falls far short of proof of undue influence."

The only evidence concerning William's lack of kindness is an attempt to show that after 1946 he did not visit his father often and rendered very little assistance to him. However, the son-in-law O'Connell testified William had been a tenant on his father's farm two different times after his father moved to town. Once for a period of seven years and the other for a period of five years. Since only contestants' evidence was offered we do not have William's side of the story. We have a right to give some consideration to the testator's statement in his will. It is possible the kindness to his father, to which the testator referred, was present as between William and his wife and the testator throughout the lifetime of testator from the time William was a boy on the farm until 1946 when the will was made. William

554

was apparently one of the older children, and this period would cover a span of 35 or 40 years. If any importance is to be attached to the fact that testator's statement concerning William's kindness was not correct, it would be the obligation of the contestants to offer proof concerning the matter. This they failed to do.

There is absence of evidence as to dominance, testator being subject to dominance, and activity in connection with making the will. There is present an unequal division of property. The presence of the one element of unequal distribution under the will, especially in view of the explanation thereof by the testator, is not sufficient to carry the case to the jury. In 95 C. J. S., Wills, section 463b(f), page 446, and (g), page 448, we find the following statements: (f) "The fact that the testator's disposition of his property was different from that which he had mentioned in a previous expression of purpose is insufficient to raise an inference of undue influence carrying such issue to the jury * * *. An unnatural disposition of property will not of itself carry the issue of undue influence to the jury. * * * (g) The issue of undue influence will not be carried to the jury by evidence which merely shows that the person charged with exercising the influence was active in connection with the making of the will, or by evidence that one charged with undue influence displayed great interest in the preparation of the will, or received a large share and was also present when the will was made."

Considering the complete record we hold there was not sufficient testimony to submit the case to the jury on the grounds of fraud or undue influence on the part of William.

VI. In will contests, there are never two cases exactly alike. A careful analysis of the state of facts in each case is necessary to arrive at a proper solution. However, there are similarities of value in previous cases. We have decided many cases in favor of proponents where the statements and actions of decedent evidenced a vastly more serious condition as to mental incapacity than appears in the testimony in this case. We could list at least fifty, but will cite only a few of our recent cases. In re Will of Muhr, 218 Iowa 867, 256 N.W. 305; In re Estate of Haga, 222 Iowa 1313, 271 N.W. 296; Campbell v. Hale, 233

Iowa 264, 6 N.W.2d 128; In re Estate of Hollis, 234 Iowa 761, 12 N.W.2d 576; In re Estate of Lochmiller, 238 Iowa 1232, 30 N.W.2d 136; In re Estate of Hadley, 241 Iowa 1280, 45 N.W.2d 140; In re Estate of Ransom, In re Estate of Moeller and Gillette v. Cable, all supra.

VII. Frederick Grahlman was 84 years of age when he made his will. He had some physical infirmity, although the evidence does not disclose any serious condition at that time nor for eight years thereafter. We have held many times that age and physical weakness or infirmity or even mere mental weakness, unless it deprives the testator of capacity for intelligent action, is not sufficient to deprive him of the right to make a will. Cookman v. Bateman, 210 Iowa 503, 231 N.W. 301; In re Estate of Ransom, In re Estate of Moeller and Gillette v. Cable, all supra.

VIII. The burden is on the contestants in a will contest to show the testator did not have mental capacity to make a will in accordance with the tests set forth in In re Estate of Rogers, supra; In re Estate of Fitzgerald, 219 Iowa 988, 259 N.W. 455; In re Estate of Kenny, 233 Iowa 600, 10 N.W.2d 73; In re Estate of Ruedy, supra.

IX. It takes more than a scintilla of evidence to justify the trial court in submitting the case to the jury. A careful analysis of all evidence in this case fails to extend it beyond this measurement. Bales v. Bales, 164 Iowa 257, 276, 145 N.W. 673, 680; In re Estate of Kenny, supra; In re Estate of Guinn, 242 Iowa 542, 47 N.W.2d 243. In the case of In re Estate of Kenny, supra, page 605 of 233 Iowa, page 76 of 10 N.W.2d, we said: "This court is committed to the doctrine that a mere scintilla of evidence will not sustain the burden of proof." As applied to will contests, the rule is concisely stated in Bales v. Bales, supra: "It was formerly considered necessary in all cases to leave the question to the jury if there was any evidence in support of the case, but it is now settled that the question for the judge is, not whether there is literally no evidence, but whether there is any that ought reasonably to satisfy the jury that the fact sought to be proved is established. This rule has been adopted and followed in this state for many years."

We find the following statement in 95 C. J. S., Wills, section 462b(1), page 425: "It has been held that some evidence of incapacity is not sufficient to take the issue to the jury, that a mere scintilla is insufficient, and that, where there is no evidence sufficient reasonably to satisfy the jury that the testator lacked capacity, the issue should not be submitted, as where the evidence of incapacity would be insufficient to support a verdict against the will; but that to create a jury issue the evidence should be such as may reasonably satisfy the jury of the fact of incapacity."

The motion to dismiss appeal filed by appellee herein is overruled. The trial court correctly sustained motion to direct verdict against contestants. The order is affirmed.—Affirmed.

All JUSTICES concur.